# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

In re:

**Irene Mulkerin,**

**Debtor.**

Case No: 1:24-bk-02752-HWV

Chapter 7

FILED
**December 4, 2024**
Clerk, U.S. Bankruptcy Court
Middle District of Pennsylvania
Wilkes-Barre

## DEBTOR'S MOTION FOR PROTECTIVE ORDER AND RELIEF REGARDING THE COMPROMISE OF THE TRUST LITIGATION

NOW COMES the Debtor, Irene Mulkerin, and respectfully moves this Honorable Court for a Protective Order and Relief to ensure the integrity of the litigation process, prevent coercion, and protect her rights as a beneficiary of the TT/Papoutsis Family Trust and the subject of ongoing bankruptcy proceedings. In support thereof, the Debtor states as follows:

## INTRODUCTION

1. The Debtor is a beneficiary of the TT/Papoutsis Family Trust and a litigant in an action against Wilmington Trust Company and Andrew Papoutsis (the "Trust Litigation"), which has been compromised without Debtor's consent.

2. On December 2, the Trustee, Mr. Steven Carr, has filed a motion to approve a settlement in the Trust Litigation for $3.15 million, despite material changes to the settlement terms and substantial evidence of fiduciary misconduct, financial discrepancies, and coercion during the negotiation process.

3. Trustee filed to appoint Debtor's Delaware counsel, Dan Atlas, as a special counsel to execute the settlement agreement, despite outstanding concerns regarding the unresolved issues in the litigation.

4. The Debtor seeks this Court's intervention to halt any approval of the settlement until these matters are thoroughly investigated and the Debtor's rights are safeguarded.

---

## FACTUAL BACKGROUND

### Improper Influence by Unnamed Parties

5. The Trust Litigation explicitly names Wilmington Trust Company and Andrew Papoutsis as defendants. However, settlement negotiations have been led by the following individuals and their representatives:

### Unusual Representation of Attorneys by Attorneys

- The Debtor notes with concern the complexity and peculiarity of the representation arrangements involving key individuals associated with the Trust:

- Mr. Don L. Kornfield is both an attorney and the Trustee of the TT/Papoutsis Family Trust. Despite his legal expertise and fiduciary role, he is represented by his own attorney, Mr. Matt D'Amelio, Esq.

- Mr. Bradley J. Leber serves as the Trust Protector and is also an attorney by profession. Yet, he is represented by his attorney, Mr. Daniel Hayworth, Esq.

- The Debtor finds it highly unusual that attorneys in fiduciary roles within the Trust are engaging additional attorneys to negotiate on their behalf in matters directly related to the Trust and her interests. This layering of legal representation raises several concerns:

- **Transparency Issues:** The involvement of multiple attorneys may obscure who is making decisions and on what authority, making it difficult for the Debtor to understand the negotiation process and to whom she should direct her communications.

- The Debtor respectfully questions why these fiduciaries, who are themselves attorneys presumably well-versed in legal and trust matters, require separate legal representation for negotiations that fall within their professional expertise and fiduciary duties. This situation seems unnecessary and may not serve the best interests of the Trust or its beneficiaries.

- **The Debtor requests that the Court:**

- **Clarify the Roles and Representations:** Order a full disclosure of the roles, responsibilities, and representation arrangements of all parties involved, to ensure transparency and proper communication channels.

- **Assess the Necessity and Appropriateness of Additional Legal Representation:** Evaluate whether it is appropriate for fiduciaries who are attorneys to engage separate counsel for matters within their scope of duties, and whether this practice aligns with their obligations to act in the best interests of the Trust and its beneficiaries.

- **Ensure Fiduciary Compliance:** Remind all fiduciaries of their duties under trust law and the need to avoid unnecessary expenses and conflicts of interest that could harm the Trust or the beneficiaries.

- **Robert Chernicoff:**

  - Apparently representing Papoutsis et al.

  - His exact role remains unclear, and he declined to provide further elaboration on his representation or involvement during open court proceedings.

6. These individuals, who were neither named defendants nor formally authorized to represent the trust in the Delaware litigation, have acted in ways that appear to prioritize the interests of Wilmington Trust and Andrew Papoutsis over those of the debtor or the other beneficiaries.

7. The involvement of these parties, particularly their refusal to authorize reasonable distributions while forcing settlement under duress, constitutes a breach of fiduciary duty and raises serious questions about the fairness and validity of the settlement process.

8. These individuals, who were neither named defendants nor formally authorized to represent the trust in the Delaware litigation, have acted in ways that appear to prioritize the interests of Wilmington Trust and Andrew Papoutsis over those of the debtor or the other beneficiaries.

9. The involvement of these parties, particularly their refusal to authorize reasonable distributions while forcing settlement under duress, constitutes a breach of fiduciary duty and raises serious questions about the fairness and validity of the settlement process.

## Conflict of Interest and Dual Representation

10. The Debtor's father (Andrew Papoutsis) and sisters are represented by the same attorney in this litigation, despite having conflicting interests as the grantor and beneficiaries, respectively.

11. This dual representation blatantly violates ethical rules and creates an inherent conflict of interest. This conflict was exploited to insert a non-neutral party to dishonestly administer the trust and to artificially depress the settlement value to the detriment of the Debtor.

## Misconduct by Fiduciaries

12. Bradley Leber and Don Kornfield have refused to authorize the critical distributions requested by the Debtor, using her ongoing litigation and bankruptcy as the basis for their justification.

   - Example: A $345 request for a bankruptcy filing fee was denied, as was a $55,000 request to address mortgage arrears.

13. This ongoing pattern of withholding distributions, despite the Debtor's severe financial distress, reflects a blatant failure to fulfill fiduciary duties of loyalty, impartiality, and reasonable discretion. It is, in fact, the core issue that prompted the Debtor to file her complaint with the Delaware Chancery Court in December 2023. Moreover, these actions, coupled with coercive and coordinated activities by others, ultimately forced the Debtor into bankruptcy.

14. The opposing parties have been in breach of the signed settlement term sheet since October 7, 2024, by failing to provide the required financing updates

4

explicitly outlined in the Term Sheet. This breach persisted despite multiple forceful requests from the Debtor to her attorney, Dan Atlas, urging him to obtain this information and compel the opposing parties to remedy their breach.

**Material Changes and Misrepresentation in Settlement Process**

15. Significant material changes and discrepancies have come to light since the term sheet was signed, raising serious concerns about the fairness and integrity of the proposed settlement:

16. **Unaccounted Earnings:** The discovery of a 2023 K-1 for the trust reveals over $3 million in earnings. These earnings remain unaccounted for in both the trust's financial records and the financial statements of associated closely held businesses, suggesting a lack of transparency and potential mismanagement of trust assets.

17. **Denial of Forensic Review:** Despite documented evidence indicating significant discrepancies in trust valuations and financial, the Debtor was denied the opportunity to engage a third-party forensic accountant. Her attorney, acting under apparent pressure to expedite the settlement process, refused to advocate for this essential review.

18. **Misrepresentation of Other Trusts:** The value and structure of decanted trusts for other beneficiaries were misrepresented, a tactic that appears to have been used to artificially lower the Debtor's settlement amount.

19. **Coercion to Discharge Bankruptcy:** The Debtor was pressured to discharge her bankruptcy as part of the settlement process. This pressure, applied under duress, may constitute a violation of the automatic bankruptcy stay and further demonstrates the lack of good faith in negotiations.

20. These factors collectively underscore significant financial irregularities, a lack of transparency, and potential misconduct that compromise the legitimacy and fairness of the proposed settlement. The settlement cannot be approved until these issues are thoroughly addressed and resolved.

**Coercion and Duress**

21. On October 22, 2024, Dan Atlas, disregarding the Debtor's explicitly communicated instructions, agreed to an initial 45-day financing timeline. This provision was subsequently altered on October 25, 2024, to include a financing clause with no specified timeline. Both changes were made without the Debtor's consent and directly against her expressed wishes.

22. On August 8, 2024, Mr. Atlas enlisted Andrew Sauder from Dailey LLP to participate in a call aimed at removing Irene's non-negotiable requirement for the $150,000 deposit to be non-refundable due to their history of negotiations with Papoutsis. Mr. Atlas and Mr. Sauder convinced her to remove any timeline on the $150,000 payment under the pretense that it would be faster, easier, and effectively the same as including a date—a claim that was evidently untrue.

23. Between June and October, the Debtor faced repeated threats from opposing parties, who stated they would "walk away" from the settlement and leave her with nothing. These tactics were employed to pressure her into acquiescing in settlement amount, terms and subsequently, the settlement agreement.

## III. LEGAL STANDARDS AND BASIS FOR RELIEF

### 1. Protective Orders in Bankruptcy Proceedings

Under 11 U.S.C. § 105(a), bankruptcy courts possess broad equitable powers to issue orders necessary to protect the integrity of the bankruptcy estate and ensure compliance with the Bankruptcy Code. Protective orders are particularly warranted where there is evidence of coercion, fiduciary misconduct, or actions that threaten the debtor s interests or the equitable administration of the estate.

Case law supports the issuance of protective orders to safeguard estate assets and ensure transparency in proceedings. In In re Johns-Manville Corp., 801 F.2d 60 (2d Cir. 1986), the court recognized the need for protective measures to preserve the estate and protect parties from overreaching conduct during the reorganization process. Similarly, in In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3d Cir. 1998), the court held that bankruptcy courts may impose protective measures

to prevent misuse of settlement negotiations and ensure fairness in fiduciary conduct. These principles are directly applicable to this case, where protective measures are necessary to prevent coercive settlement tactics and safeguard the Debtor s rights in the Delaware litigation, now part of the Pennsylvania bankruptcy estate.

### 2. Trustee s Fiduciary Duties Under 11 U.S.C. § 704

The Chapter 7 Trustee is obligated under 11 U.S.C. § 704 to maximize the value of the estate, ensure transparency, and act impartially in the administration of estate assets. When a trustee fails to fulfill these duties, courts have consistently found such failures to constitute breaches of fiduciary duty.

In Commodity Futures Trading Comm n v. Weintraub, 471 U.S. 343 (1985), the United States Supreme Court emphasized that a trustee must act in the best interests of the estate and its beneficiaries. Similarly, in In re AFI Holding, Inc., 530 F.3d 832 (9th Cir. 2008), the court held that trustees are held to the highest standards of loyalty and impartiality and must avoid conflicts of interest. In this case, the Trustee s refusal to authorize reasonable distributions, failure to respond to financial discrepancies, and reliance on coercive settlement tactics constitute clear breaches of these statutory duties. These actions demonstrate the need for judicial intervention to ensure compliance with fiduciary obligations and protection of the Debtor s interests.

### 3. Conflicts of Interest and Ethical Violations

Conflicts of interest among fiduciaries and their representatives undermine the integrity of bankruptcy proceedings. Courts have consistently held that such conflicts demand heightened scrutiny and remedial action to protect the estate and its beneficiaries.

In In re Consolidated Industries Corp., 397 F.3d 524 (7th Cir. 2005), the court explained that conflicts of interest affecting fiduciaries decision-making processes may warrant removal or the imposition of protective measures. In Woods v. City Nat l Bank & Trust Co., 312 U.S. 262 (1941), the United States Supreme Court reiterated that fiduciaries have a duty to avoid conflicts that could compromise their impartiality. The presence of fiduciaries with conflicting interests, including

7

dual representation of parties with adverse interests in the Delaware litigation, raises serious ethical concerns in this case. The Court should compel disclosure of these relationships and appoint neutral counsel to ensure fairness and transparency in the settlement process.

### 4. Transparency in Settlement Approval

Settlements in bankruptcy require court approval under Federal Rule of Bankruptcy Procedure 9019, which mandates transparency and a demonstration that the settlement is fair and in the best interest of the estate. The bankruptcy court s responsibility includes scrutinizing all material facts related to the settlement and ensuring the process has been conducted in good faith.

In In re Martin, 91 F.3d 389 (3d Cir. 1996), the Third Circuit held that settlement approval requires full disclosure of all material facts and evidence that the settlement is fair and equitable. Similarly, in In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007), the court emphasized that the value of a settlement must be weighed against potential recovery, and that adequate transparency is essential to this evaluation. In this case, the lack of disclosure regarding financial discrepancies, material changes to the settlement terms, and denial of forensic review undermines the fairness and integrity of the proposed settlement. These issues warrant a stay on settlement approval until the required disclosures are made and the settlement process is thoroughly reviewed.

### 5. Coercion and Duress in Settlement Negotiations

Settlements procured through coercion, duress, or undue influence are invalid under bankruptcy law, as they undermine the integrity of the process and compromise the rights of the estate and its beneficiaries. Courts have repeatedly held that settlement approval must be denied where coercion has tainted the negotiation process.

In In re Smart World Technologies, LLC, 423 F.3d 166 (2d Cir. 2005), the court held that settlements tainted by coercion or unfair tactics are voidable and must be rejected. In In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), the court stressed the importance of avoiding undue pressure in settlement negotiations and ensuring debtor participation in the decision-making process. In this case, the Debtor has presented compelling evidence of coercive tactics, including threats from opposing

parties and the Trustee s refusal to address her concerns. These actions warrant the issuance of a protective order to ensure the fairness and integrity of the settlement process.

## RELIEF REQUESTED

The Debtor respectfully requests the following relief:

### 1. Stay of Settlement Approval

The Court should stay all proceedings related to the Trustee's motion to compromise or assume executory contracts until the following issues are addressed:

- A third-party forensic analysis of trust assets and related businesses is completed.
- The Trustee provides full disclosures regarding settlement breaches, financial records, and trust valuation discrepancies.
- The Court reviews the procedural integrity of the Trustee's actions to ensure the Debtor's rights are protected.

### 2. Appointment of Neutral Counsel

- Appoint an independent, neutral trustee or attorney—preferably from outside Delaware or Central Pennsylvania—to oversee the settlement process and ensure impartiality.

### 3. Investigation of Fiduciary Misconduct

- Order an investigation into the actions of Bradley Leber, Don Kornfield, and their respective attorneys to determine whether they acted in good faith and fulfilled their fiduciary duties.

### 4. Order for Document Production

- The Trustee and opposing parties should be compelled to produce complete financial records for all trust-related entities, including but not limited to:
  - Shareholder meeting minutes

9

- Bank statements
- Tax returns
- Financing statements
- Balance sheets
- Income statements
- Statements of cash flows
- CPA-reviewed and audited reports
- All communications related to the settlement and financing arrangements.

## 5. Discovery

- Permit the Debtor to conduct limited discovery to uncover:
  i. Communications between Wilmington Trust, fiduciaries, and attorneys involved in the settlement.
  ii. Documentation related to the financial discrepancies in the trust's financials.

## 6. Stay on Settlement Approval

- Issue a stay preventing approval of the settlement until the above issues are resolved.

By issuing the requested protective order, the Court will uphold the integrity of the bankruptcy process and safeguard the Debtor s rights as a beneficiary and estate representative.

Attached hereto as **Exhibit A** are emails between the Debtor and Trustee Steven Carr.

**Respectfully submitted,**
**/s/Irene Mulkerin**

**Irene Mulkerin**

# EXHIBIT A

*(Emails between Irene Mulkerin and Trustee Steven Carr)*

# UNITED STATES BANKRUPTCY COURT MIDDLE DISTRICT OF PENNSYLVANIA

In re:
**IRENE MULKERIN,**
Debtor.

Chapter 7
Case No. 1:24-bk-02752-HWV

## ORDER GRANTING DEBTOR'S MOTION FOR PROTECTIVE ORDER AND RELIEF REGARDING THE COMPROMISE OF THE TRUST LITIGATION

**Upon consideration of the Debtor's Motion for Protective Order and Relief Regarding the Compromise of the Trust Litigation** (the "Motion"), filed by the Debtor, **Ms. Irene Mulkerin, pro se, and** the Court having reviewed the Motion and the record in this case, and good cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. **Stay of Settlement Approval**

   o All proceedings related to the Chapter 7 Trustee's motion to compromise or assume executory contracts concerning the Debtor's interest in the **TT/Papoutsis Family Trust** and the related litigation (the "Trust Litigation") are hereby **STAYED** until further order of this Court.

2. **Appointment of Neutral Counsel**

   o An independent, neutral trustee or attorney, unaffiliated with parties from Delaware or Central Pennsylvania, shall be appointed by the Court to oversee the litigation and settlement process of the Trust Litigation to ensure impartiality and fairness. The United States

1

Trustee is directed to recommend a qualified individual for this appointment within **14 days** of the date of this Order.

3. **Investigation of Fiduciary Misconduct**

   o An investigation is hereby authorized into the actions of **Mr. Bradley J. Leber, Mr. Don L. Kornfield**, and their respective attorneys, to determine whether they have acted in good faith and fulfilled their fiduciary duties to the Debtor and the bankruptcy estate.

4. **Order for Document Production**

   o The Chapter 7 Trustee and the opposing parties in the Trust Litigation are **COMPELLED** to produce to the Debtor and the Court, within **30 days** of the date of this Order, complete and accurate copies of all financial records related to the TT/Papoutsis Family Trust and associated entities, including but not limited to:

      ▪ Shareholder meeting minutes

      ▪ Bank statements

      ▪ Tax returns

      ▪ Financing statements

      ▪ Balance sheets

      ▪ Income statements

      ▪ Statements of cash flows

      ▪ CPA-reviewed and audited reports

      ▪ All communications related to the settlement and financing arrangements

5. **Authorization for Limited Discovery**

   o The Debtor is granted leave to conduct limited discovery related to:

      ▪ Communications between **Wilmington Trust**, fiduciaries, and attorneys involved in the settlement negotiations

2

- Documentation pertaining to financial discrepancies in the Trust's financials
  - Such discovery shall be conducted in accordance with the Federal Rules of Bankruptcy Procedure and completed within **60 days** of the date of this Order.

6. **Disclosure of Representation and Roles**

   - All parties involved in the Trust Litigation and settlement negotiations, including but not limited to **Mr. Don L. Kornfield, Mr. Bradley J. Leber, Mr. Robert E. Chernicoff**, and their respective attorneys, are ordered to disclose their roles, representation arrangements, and any potential conflicts of interest to the Court and the Debtor within **14 days** of the date of this Order.

7. **Protection of the Debtor's Rights**

   - The Chapter 7 Trustee and all parties are reminded of their fiduciary duties under the Bankruptcy Code, including the duty to maximize the value of the estate and to act transparently and in good faith. The Debtor's rights to participate in proceedings affecting her estate must be respected.

8. **Prohibition of Coercive Actions**

   - All parties are prohibited from engaging in any form of coercion, undue influence, or actions that may compromise the Debtor's rights or the integrity of the bankruptcy process. This includes but is not limited to pressuring the Debtor to withdraw her bankruptcy petition or to accept settlement terms without adequate information and opportunity for informed consent.

9. **Further Relief**

   - The Court retains jurisdiction to issue further orders as necessary to enforce and implement the provisions of this Order and to grant such other and further relief as may be just and proper.

**IT IS SO ORDERED.**

3

Dated: _____, 2024

**HENRY W. VAN ECK**
**Chief United States Bankruptcy Judge**

**NOTICE TO ALL PARTIES:**

Failure to comply with the terms of this Order may result in sanctions, including but not limited to contempt of court, monetary penalties, or other appropriate remedies as determined by the Court.

4

**Subject:** Urgent Matter Regarding Potential Violation of Automatic Stay
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/10/24, 9:51 PM
**To:** Steven Carr <carr20@aol.com>
**BCC:** Irene Mulkerin <irene.papoutsis@gmail.com>, "andy.mulkerin.pro-se@outlook.com"
<andy.mulkerin.pro-se@outlook.com>

Dear Mr. Carr,

Following my previous email, I wanted to bring some pressing matters to your attention that I believe are relevant to my bankruptcy case.

On Thursday, November 7, I emailed Attorney Robert E. Chernicoff requesting that a scheduled sheriff's visit to our home be rescheduled due to my bankruptcy filing, to ensure compliance with bankruptcy protocols. Unfortunately, my request was not acknowledged, and the sheriff proceeded with the visit, conducting an inventory of our jointly owned property.

Then, on Friday evening, November 8, I received communication from Mr. Chernicoff, who apparently represents my father, Andrew V. Papoutsis; Wilmington Trust; the trustee of my trust, Don Kornfield; and associated entities involved in ongoing litigation I've been pursuing in the Delaware Chancery Court. In his correspondence, he appears to pressure me into dismissing my bankruptcy case and settling the litigation under terms that may not be in the best interest of my bankruptcy estate.

I believe these actions may constitute a violation of the automatic stay and could impact the administration of my bankruptcy estate.

I'm attaching the email correspondence from Attorney Chernicoff from the evening of November 8, as well as my email requesting the rescheduling of the sheriff's visit sent on the morning of November 7. I thought it important for you to have this information before our meeting tomorrow.

There's a lot more to discuss regarding these and potentially related matters, and I'm looking forward to speaking with you about them.

Thank you again for your time, and I'll see you tomorrow.

Best,

Irene Mulkerin

---

—Attachments:———————————————————————————————

| | |
|---|---|
| Chernicoff email to IPM 11.8.2024.pdf | 598 KB |
| IPM email to Chernicoff on 11.7.2024.pdf | 444 KB |

**Subject: Request to Reschedule Sheriff's Visit Due to Ongoing Bankruptcy Proceedings**
**From:** Irene Mulkerin <IMCEAEX-
_O=FIRST+20ORGANIZATION_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=0003400280DEC8A9@sct-15-20-7719-20-
msonline-outlook-619d4.templateTenant>
**Date:** 11/7/24, 10:01 AM
**To:** "rec@cclawpc.com" <rec@cclawpc.com>
**BCC:** "andy.mulkerin.pro-se@outlook.com" <andy.mulkerin.pro-se@outlook.com>

Dear Mr. Chernicoff,

I hope this message finds you well. I am writing regarding the scheduled sheriff's visit to our home this afternoon to enforce a levy or money judgment against my husband, Andy Mulkerin.

As you may be aware, I have recently filed for Chapter 7 bankruptcy (Case No. 1:24-bk-02752-HWV) and have an upcoming meeting with the bankruptcy trustee, Mr. Steven Carr, to discuss matters related to my estate. Given that all of our personal property is jointly owned, and considering the automatic stay in effect due to my bankruptcy filing, I respectfully request that the sheriff's visit be rescheduled until after my meeting with the trustee early next week.

Postponing the visit would allow us to address any asset-related concerns appropriately and ensure that we are all adhering to the correct legal protocols. Additionally, having sheriffs come to our home at this time would be quite stressful for our family, especially our two young sons, given everything we've been through.

I understand that Andy is not a party to my bankruptcy case, but since you have expressed interest in following the proceedings, I believe it would be prudent to wait until after my initial meeting with the trustee. This would help avoid any potential complications related to jointly owned property and ensure that all actions are in compliance with the bankruptcy court's directives.

Thank you for your understanding and consideration. Please let me know if we can discuss this matter further or if there is any additional information you need from me.

Sincerely,

Irene Mulkerin
Phone: 646-812-1923
Email: irene.mulkerin@outlook.com

**Subject:** Fw: Irene Mulkerin v The Wilmington Trust Company, et al; Andrew Papoutsis; Adnrew D. Papoutsis Trust; APX entities, et al
**From:** Daniel Atlas <Datlas@daileyllp.com>
**Date:** 11/8/24, 7:34 PM
**To:** Irene Mulkerin <irene.papoutsis@gmail.com>

Irene – please see the below correspondence from bankruptcy counsel on behalf of your family and others. Let me know when you would like to discuss.

Best,
Dan

Get Outlook for iOS

From: Robert Chernicoff <rec@cclawpc.com>
Sent: Friday, November 8, 2024 5:38:23 PM
To: Daniel Atlas <Datlas@daileyllp.com>
Cc: Joanne Bartley <jbartley@cclawpc.com>; ctiches@apx-enclosures.com <CTiches@apx-enclosures.com>; Don Kornfield (Don@kornfield.net) <Don@kornfield.net>
Subject: Irene Mulkerin v The Wilmington Trust Company, et al; Andrew Papoutsis; Adnrew D. Papoutsis Trust; APX entities, et al

> **IRONSCALES couldn't recognize this email as this is the first time you received an email from this sender**
> rec@cclawpc.com

I have been consulted with respect to the above litigation and certain matters related thereto on behalf of Mr. Papoutsis, the Apex companies and other defendants in the above litigation and as to the effect of Irene Mulkerin, the plaintiff in the above litigation, having filed bankruptcy. It is my understanding that you represent Mrs. Mulkerin.

In case you are not aware of it, Irene Mulkerin filed a petition under Chapter 7 of the United States bankruptcy code last month in the United States Bankruptcy Court for the Middle District of Pennsylvania. As a result of the bankruptcy filing, all of Irene's assets are subject to the jurisdiction of the United States Bankruptcy Court to be administered by the Chapter 7 Trustee. These assets would include any rights which she asked might have to receive anything at all from the above Trust as well as any funds which she might otherwise receive from the settlement agreement which has been negotiated between her and the other parties to the above litigation. Essentially, this means that even if she would now settle, the funds in question would have to be paid to the bankruptcy trustee for administration under the United States Bankruptcy Code.

It is my understanding that while the settlement agreement has been fully negotiated and that the parties have executed a term sheet, which has been incorporated into the settlement agreement, that Ms. Mulkerin has not yet signed the settlement agreement.

We are prepared to notify the bankruptcy trustee of the existence of her interest in the trust and the fact that she could receive a distribution under the settlement agreement. This would expose the full amount of the trust distribution to administration by the Chapter 7 trustee for payment to

all secured and unsecured creditors. We believe that it is necessary for the trustee to be informed of the

I would not only have to inform the bankruptcy trustee of the existence of the term sheet and the settlement agreement, but unless we come to an agreement whereby the settlement would proceed expeditiously, we would be filing an appropriate motion with the bankruptcy court to enforce the settlement agreement.

If Mrs. Mulkerin would voluntarily dismiss her bankruptcy case, we would defer filing the motion set forth above. The dismissal motion would still have to be approved by the court, following notice to creditors. Undoubtedly, the trustee would make appropriate inquiry as to her assets. There may be some ability by her negotiate a settlement with the creditors based upon the existence of the term sheet and the settlement agreement.

If Mrs. Mulkerin proceeds with the settlement as set forth in the settlement agreement, distribution to her would occur very quickly after dismissal of the bankruptcy case or approval of the court. This would provide her with the opportunity to deal with the creditors who are executing on her house.

I am also authorized to offer as a settlement proposal only that if she would sign the settlement agreement and upon fulfillment of all of her obligations thereunder, that the A Papoutsis Family Partnership would provide an offer to buy her interest in such family partnership, again following dismissal of her bankruptcy case.

If you wish to discuss further, my contact information is set forth below.

Robert E. Chernicoff, Esq.

Cunningham, Chernicoff & Warshawsky, PC

2320 N.2nd St.

Harrisburg, PA 17110

717-238-6570

fax 717-238-4809

rec@cclawpc.com

The information contained in this email and attachments is confidential, privileged information and is attorney work product, intended for the individual or entity named above. If the reader of this email is not the intended recipient, the reader is hereby notified that any dissemination, distribution, or copy of this information is strictly prohibited. If you have received this email in error, please notify us by telephone or email

2 of 3

Case 1:24-bk-02752-HWV   Doc 55   Filed 12/04/24   Entered 12/04/24 15:36:31   Desc
Main Document      Page 19 of 51                                    12/4/24, 12:48 PM

**Subject:** Re: Prioritization Request – Liquidation of Interests
**From:** Steven Carr <carr20@aol.com>
**Date:** 11/12/24, 9:22 AM
**To:** irene.mulkerin@outlook.com

Noted.    Assuming that I am able to liquidate the partnership interest and that generates enough money to pay unsecured creditors in full, I will not be looking to liquidate further assets.

**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA  17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged.  This message may also be privileged and attorney work product.  It is intended for the individual or entity named above.  If you are not the intended recipient, please do not read, copy, use or disclose this communication to others.   You are notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

In a message dated 11/12/2024 7:03:21 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

> Dear Mr. Carr,
>
> Thank you again for taking the time to meet with me yesterday. I am actively working on my schedules now. After careful consideration and reflection, I request that you liquidate my interests in the Andrew V. Papoutsis Family Limited Partnership.
>
> Thank you again very much.
>
> Best,
> Irene Mulkerin

**Subject:** Re: Prioritization Request – Liquidation of Interests
**From:** Steven Carr <carr20@aol.com>
**Date:** 11/13/24, 11:01 AM
**To:** irene.mulkerin@outlook.com

Ms. Mulkerin:

Please forward the Garcia appraisals for the three commercial properties.

It remains my intent to first liquidate the partnership interest, as per your request. But upon further review, I note that there are two major issues associated with that endeavor; tax implications and finding a buyer for fair market value.

As to tax implications, the sale of the interest will obviously result in a taxable gain. I don't know what the original tax basis of the lp interest is, but am guessing that it is a low number. If so, a significant portion of the sale price will be subject to a 20% capital gains tax, which likely will be $100,000-$200,000.00 depending on the basis and the ultimate sale price. I don't know this, but it is possible that a settlement on the trust will not generate such a large tax obligation.

As to the sale "price," it is highly unlikely that I can find a "buyer" for the true market value of the partnership interest. This is always a problem with limited partnership interests, and one that Trustees have encountered in the past. I have thoroughly reviewed the partnership agreement, and recognize that my hands are somewhat tied. A limited partner, by design, has no voice in the operation of the partnership. I can't, as a minority interest, force a sale or liquidation of the partnership or its assets. Rather, I am limited to offering the lp interest first to the other partners. If they decline, I can then sell it to a third party.

Therein lies the problem. We have valuable real estate assets that are certainly creating value, but not generating any return on the investment at present. What's worse, except for the increasing value, is that it is now generating income of $100,000.00 per partner per year, which results in a significant tax obligation that is not being reimbursed by the partnership.

Thus, even if the partnership interest is worth a hypothetical $1,000,000.00, the remaining partners are not likely to pay me that. If I then go to the world at large, who is going to pay me $1,000,000.00 for an asset that is totally within the control of someone they don't know, can't easily be sold, causes an annual cash drain and not a cash flow, and when the ultimate payoff of the investment is years down the road? The answer is no one. Any possible investor is going to dramatically discount the amount that they are willing to pay.

Obviously, if the asset were turned back to you because I liquidated the trust, you are stuck with the same problem. But you/your children would have the time to see it ultimately generate full value.

If any of my observations causes you to change your mind and want me to first liquidate the trust interest as per the settlement term sheet, I will go in that direction. Otherwise, I will still look to sell the lp interest for the best price that I can get.

**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email,

and delete the message from your computer system.

In a message dated 11/12/2024 7:03:21 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

> Dear Mr. Carr,
>
> Thank you again for taking the time to meet with me yesterday. I am actively working on my schedules now. After careful consideration and reflection, I request that you liquidate my interests in the Andrew V. Papoutsis Family Limited Partnership.
>
> Thank you again very much.
>
> Best,
> Irene Mulkerin

**Subject:** Re: Update on Litigation and Settlement Paths; Inclusion of Legal Services Agreement
**From:** Steven Carr <carr20@aol.com>
**Date:** 11/14/24, 11:38 AM
**To:** irene.mulkerin@outlook.com

1. The Wilmington Trust litigation is property of the estate and therefore within my "control," not yours. But I have no issue with you doing whatever you feel you need to do in order to remove your "objection" to the settlement. It is my belief that the other parties stand ready to commit to the settlement. Thus, the only thing standing in the way of me pursuing that settlement is your stated preference that I attempt to liquidate the lp interest first.

2. Thank you for the engagement letter. If I pursue the settlement, I will hire your attorney on the same terms.

3. Incorrect. I am only authorized to obtain records that I need for me.

**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

In a message dated 11/14/2024 11:22:18 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

> Dear Mr. Carr,
>
> I hope this message finds you well. I wanted to provide an update on my situation and seek your guidance on a few items.
>
> 1. I am considering proceeding concurrently with both the settlement discussions and litigation in the Wilmington Trust case and should be able to provide you with a detailed update in the next 1-2 weeks. Is this approach acceptable to you?
>
> 2. I realized that I didn't include my attorney agreement in my initial filing, so I'm attaching it here for your reference. However, I'm unsure where and how it should be best included in my schedules. Could you advise on the correct way to notate and include this contract?
>
> 3. I've done some research and understand that, as the trustee, you may have the ability to request documents on my behalf that I am legally entitled to receive. Could you let me know if this is accurate, and if so, how this process works?
>
> Thank you so much.
>
> Best,

**Subject:** Update on Litigation and Settlement Paths; Inclusion of Legal Services Agreement
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/14/24, 11:22 AM
**To:** Steven Carr <carr20@aol.com>
**BCC:** Irene Mulkerin <irene.papoutsis@gmail.com>, "andy.mulkerin.pro-se@outlook.com" <andy.mulkerin.pro-se@outlook.com>

Dear Mr. Carr,

I hope this message finds you well. I wanted to provide an update on my situation and seek your guidance on a few items.

1. I am considering proceeding concurrently with both the settlement discussions and litigation in the Wilmington Trust case and should be able to provide you with a detailed update in the next 1-2 weeks. Is this approach acceptable to you?

2. I realized that I didn't include my attorney agreement in my initial filing, so I'm attaching it here for your reference. However, I'm unsure where and how it should be best included in my schedules. Could you advise on the correct way to notate and include this contract?

3. I've done some research and understand that, as the trustee, you may have the ability to request documents on my behalf that I am legally entitled to receive. Could you let me know if this is accurate, and if so, how this process works?

Thank you so much.

Best,

Irene Mulkerin

---

─Attachments:─────────────────────────────────

2024-03-22_Mulkerin Engagement Letter.pdf                    194 KB

**Subject:** Update on Distribution Requests from TT/Papoutsis Family Trust
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/15/24, 2:07 PM
**To:** Steven Carr <carr20@aol.com>
**BCC:** Irene Mulkerin <irene.papoutsis@gmail.com>, "andy.mulkerin.pro-se@outlook.com" <andy.mulkerin.pro-se@outlook.com>

Dear Mr. Carr,

Thank you for your response to my questions yesterday.

In terms of current funds, I thought I should let you know that since filing for bankruptcy, I have made two requests to the Trust Protector/ Distribution Advisor, Mr. Bradley Leber:

1. $345 Request to pay for the bankruptcy filing fees (Submitted on October 26, 2024)
2. $55,000 Request to pay for a bankruptcy attorney, mortgage arrears, etc to help me through this process (Submitted on November 4, 2024)

Both of these distributions have been denied stating that "no distributions will be considered" until I sign their settlement agreement.

During our meeting, you mentioned that the group managing my trust may have reason to deny my distribution requests, perhaps seeing it as me "biting the hand that feeds me;" however, this is not a new situation, as they have consistently withheld distributions under various pretexts long before I filed suit.

Below is a summary of my previous requests, distribution advisor, and the responses received:

3. **$272,000 Request for mortgage (Johnny Papoutsis (Cousin))**
   - **Start Date: April 13, 2023**
   - **End Date: May 25, 2023**
     **Outcome:** John resigned b/c he didn't want involved in family disputes; WTC agreed to give me $70,000 on May 25, while a new Distribution Advisor was installed to review completing the request.
   - **Waiting Period: 43 days**

4. **$202,000* (Alex Snyder) *remainder of original request**
   - **Start Date:** July 25, 2023
   - **End Date:** August 8, 2023
   - **Response:** Rejected because he claimed to have resigned, though according to Trustee WTC, he was still the Trust Protector for a couple months after his claimed resignation
   - **Waiting Period: 15 days**

5. **$202,000 Request (Mac Brillhart) *remainder of original request**
   - **Start Date:** August 15, 2023
   - **Response Date:** September 1, 2023
   - **Response:** Rejected due to "liquidity" concerns

○ **Waiting Period:** 17 days

6. **$86,000 Request (Mac Brillhart)**

   ○ **Start Date:** September 21, 2023

   ○ **Response Date:** October 16, 2023

   ○ **Response:** Rejected; Mr. Brillhart stated he "wasn't going to respond" to my request with no other reasons provided

   ○ **Waiting Period:** 25 days

7. **$8,000 Mortgage Assistance Request (Mac Brillhart)**

   ○ **Start Date:** September 25, 2023

   ○ **End Date:** November 28, 2023

   ○ **Response:** Rejected; no response received from Wilmington Trust or Mr. Brillhart

8. **$23,000 Request (Mac Brillhart)**

   ○ **Start Date:** October 9, 2023

   ○ **End Date:** November 28, 2023

   ○ **Response:** Rejected; no response received from Wilmington Trust or Mr. Brillhart.

9. **$272,000 Request (Bradley Leber)**

   ○ **Start Date:** December 8, 2023

   ○ **End Date:** Rejected; no response was received.

10. **$272,000 Request (Bradley Leber)**

    ○ **Start Date:** March 15, 2024

    ○ **End Date:** April 29, 2024

    ○ **Response:** Withdrawn; the request was withdrawn on advice of counsel after 45 days when Mr. Leber only then asked for more specifics on the intended use of funds.

    ○ **Waiting Period:** Withdrawn after 45 days

In response to my March 15, 2024, request for $272,000 to prevent foreclosure on my home, Mr. Leber initially stated that any distribution would need to be carefully evaluated to ensure the trust's liquidity and long-term health, citing ongoing litigation. Now, however, he has shifted his stance, claiming no distributions will be considered unless I agree to the settlement. This again points to a pattern of using inconsistent justifications to withhold distributions, irrespective of my financial needs or the trustee's fiduciary obligations.

According to my attorney, Dan Atlas, there's little that can be done in this situation—they consistently find reasons to deny my requests. He explained that this is essentially how it works when both the Grantor and Trustee decide not to release the funds, regardless of the circumstances.

I understand that you do not have the authority to directly impact this situation, and to be clear, I am not

asking for your assistance in this matter, as I recognize that your role is to work on behalf of my estate. However, I wanted to forward my two most recent requests ($345 and $55,000) made after filing for bankruptcy. These efforts were part of my attempt to address my bankruptcy obligations and creditors proactively, even though, as of now, they remain unsuccessful.

Thank you so much.

Best,

Irene

—Attachments:————————————————————————————

| | |
|---|---|
| 2024–10–26 Request for Distribution.pdf | 99.5 KB |
| 2024–11–4 Request for Distribution .pdf | 428 KB |

3 of 3

Case 1:24-bk-02752-HWV    Doc 55    Filed 12/04/24    Entered 12/04/24 15:36:31    Desc
Main Document    Page 27 of 51    12/4/24, 12:11 PM

**From:** Steven Carr <carr20@aol.com>
**Date:** 11/21/24, 3:36 PM
**To:** irene.mulkerin@outlook.com

Ms. Mulkerin:

I have received an offer of $300,000.00 for your limited partnership interest. I have rejected that and countered with $500,000.00. I have no sense of whether that counter will be accepted. They may well stick to the $300,000.00.

As I wrote to you previously, I am not surprised by the amount of the offer. I also believe my counter is prudent under the circumstances given that I have not been able to find a broker who is willing to take on the marketing of the limited partnership interest. Thus, I have a rather thin pool of potential buyers at present. For that reason, I am inclined to accept whatever offer is in their response.

While a $500,000.00 settlement ought to pay all of your unsecured creditors in full, it will not be enough to pay your mortgage holders. That is not my concern as Trustee, but I recognize that paying the mortgages and saving the house is a primary concern for you.

Given that the liquidation of the lp interest will not solve your mortgage problem, perhaps you now want to re-think the order of liquidation request you made to me. I can easily turn my focus to a resolution of the trust litigation and cease my efforts to liquidate the partnership interest.

I have confirmed that the Trust, at the moment, remains willing to consummate the $3.15 million settlement. and is able to promptly fund the settlement. Obviously, that will generate enough money to pay your unsecured creditors and the mortgages and thereby save the house.

I have touched base with Attorney Atlas. He understands that the litigation at present is property of the bankruptcy estate and is controlled solely by me as Trustee. I have advised him to remain on hold with the litigation at present. He is not authorized to pursue any of the items set forth in your Nov 20 email.

I also advised him that if the lp is liquidated and I receive sufficient money to pay your unsecured creditors, I will then abandon the trust litigation to you and relinquish control of that litigation back to you.

Finally, while I appreciate the apology for making a false statement, do not make any further false representations involving me.

**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

**Subject:** Quick Update
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/21/24, 10:57 AM
**To:** Steven Carr <carr20@aol.com>

Dear Mr. Carr,

I hope your week has been going well. I wanted to provide a brief update regarding my attorney, as I'm feeling quite frustrated with his handling of my concerns at the moment. While I know you can't offer legal advice, see below, he wants to talk to you directly, so I wanted to ensure you have the right context for anything Dan might discuss with you. I apologize that I said that you wanted a case summary (I know you didn't ask for that) but I have been having a lot of trouble getting him to address my issues.

Thank you so much!

Best,
Irene

--------- Forwarded message ---------
**From:** Irene Mulkerin <irene.papoutsis@gmail.com>
**Date:** Thu, Nov 21, 2024 at 10:36AM
**Subject:** Re: Request for Detailed Case Summary
**To:** Daniel Atlas <datlas@daileyllp.com>

## Hey Dan,

If you feel you need to reach out to the trustee, I understand and pls include me in all correspondence (keep it written). However, I want to be clear that I DO NOT want you from going on the call with Chernoff. Participating in that call, even in listening mode, is detrimental to my interests. Anything they have to say regarding offers or negotiations needs to be put in writing, and I expect them to do so.

Please focus on addressing my email seriously and making that the priority vs chasing more crooked lawyers around. Let's focus on the critical items I've outlined instead of diverting attention to more bs.

Let me know where things stand on the items we've discussed.

Sincerely,
Irene Mulkerin

Concision and typos courtesy of on-the-go technology.

On Nov 21, 2024, at 10:20 AM, Daniel Atlas <datlas@daileyllp.com> wrote:

Irene: as previously stated, I can take no further action with regards to the settlement and the litigation without speaking directly with the Trustee. You stated that the trustee requested a high-level summary of the litigation; that is what I provided. The time is now for me to reach out to the Trustee; I plan on doing so today, and will cc you on that correspondence.

This action is necessary because, based on your email, there is significant confusion about the current state of affairs. You state that the Trustee "is currently focused on liquidating the LP assets." The trustee would have no such authority to do so. The assets in the LP are not yours, they are held by the LP, which your father manages as the General Partner. I see no basis why the Trustee would be focusing on the LP in the context of your Chapter 7 Bankruptcy. There appears to be confusion that needs to be clarified.

Finally, bankruptcy counsel for your father/APX reached out to me last night about having a call this afternoon ("You have time tomorrow to talk around 2 PM I should have a great deal of information to provide to you and a possible resolution"). I will join that call this afternoon purely in listening mode to see what he has to say, but making quite clear that I have no authority to respond on any point he may raise. I am copying you on my correspondence with him.

Best,
Dan

--------- Forwarded message ---------
**From:** Irene Mulkerin <irene.papoutsis@gmail.com>
**Date:** Wed, Nov 20, 2024 at 4:05 PM
**Subject:** Re: Request for Detailed Case Summary
**To:** Daniel Atlas <datlas@daileyllp.com>

Hey Dan,

Thanks for your email. I hope we can use this opportunity to realign our efforts, address the pressing issues comprehensively, and regain momentum to ensure the best possible outcome. Before deciding whether proceed, I need to clarify several critical points. As you've noted, the decision ultimately rests with me, and Mr. Carr, the trustee in my bankruptcy case, has indicated he can weigh in when appropriate but is currently focused on liquidating the LP assets. While I do not yet have a bankruptcy attorney, Mr. Carr's plan gives us time to reassess, act more deliberately and carefully consider whether to continue settlement discussions or move forward with litigation.

Things I need in order to do that:

1. The more I've reflected on this, the missing Schedule A from the original doc has become increasingly clear as a critical piece of the puzzle. This document is essential for understanding the valuation of the companies at the time they were placed into the trust. (Please request it directly from Wilmington Trust's counsel.)

2. Also, before speaking with Jen, I want her to have all the York Sheet Metal financial documents I sent you in March to ensure she has the necessary context to provide her opinion. As I've emphasized before, I want Dailey LLP to formally engage Jen on my behalf to effectively advance this matter. The financial documents I sent you in March, show York Sheet Metal shareholder distributions totaling millions of dollar.

3. Finally, I'd like a list of all documents I am legally entitled to and a please plan to request them from the appropriate parties. These additional materials will either strengthen our negotiating leverage or bolster our trial position, depending on what we uncover. This effort is crucial to fully understand how the fraud was structured and the extent of any breaches or misconduct.

4. Laura's decanted trust mirrors the original trust and Jamie's trust but consists of cash rather than assets. She does not have access to funds beyond what any of us had during the past 12 years. I know this arrangement predates the original trust and Jamie's trust from the term sheet (which was wrong in the summary you sent me) and I now see it was a deliberate and successful attempt to lower my settlement number. They manipulated me again. I was informed this transaction was tied directly to reducing my valuation. I need you to review your notes and provide the exact date you were informed of this, along with any supporting details, as I recall you telling me on the phone. This is a critical point, and I want to ensure we pin it down as precisely.

5. While I appreciate the effort you've made in outlining some of the key dates and information for the Trustee, what I need is a comprehensive case summary that details the background of the litigation and negotiations, explaining how we arrived at the current settlement. Please address the strategies we've explored, the paths we set aside, and the rationale behind each. Additionally, I need an updated analysis of the options now available, particularly considering the bankruptcy filing and the additional time it affords us to act strategically.

6. I know this is a contingency case, but I would appreciate a summary of the hours you and your team have invested. Understanding the effort put into this case provides important context as we proceed.

7. In May/June, I agreed to focus on settlement because I was under severe financial pressure. However, bankruptcy has alleviated the immediate strain. The delays and obfuscations have clearly benefited the other side, and we need to shift gears to protect my interests. They've successfully controlled this process and systematically squeezed me down to where we are now. While I understand that you previously said you didn't believe this was the case for whatever reason, I think if you take a step back and look at it objectively, you'll see it's quite clear.

8. As I continue to piece together what has happened—and what is still ongoing—I am increasingly convinced that the trust protectors and distribution advisors are deeply involved wrong-doing, yet they are not named defendants in our complaint. Their actions and timing strongly suggest coordinated misconduct that demands further scrutiny.

9. A pivotal realization for me was understanding the broader motive behind Wilmington Trust's actions. Their ultimate strategy seems to revolve around lowering their customer acquisition costs by effectively capturing a wealthy client's estate in perpetuity. This is achieved by securing long-term control of assets (often through the mandated sale of closely held businesses upon the grantor's death), ensuring a substantial inflow of capital for their management. This trust structure allows the client, in this case my father, to enjoy the benefits of control and wealth during his lifetime while guaranteeing that the assets transfer to Wilmington Trust's control upon his passing. For them, this arrangement is highly lucrative—it secures a profitable client relationship across generations with minimal effort.

This is a substantial case with high stakes for both me and your firm. It's time to take a more assertive and comprehensive approach to achieve the best possible outcome.
Let me know if you need clarification on anything outlined here.

Thanks so much!

Irene

---

**Draft Complaint Introduction for your thoughts**

*"I am a beneficiary of an irrevocable trust managed by Wilmington Trust, a subsidiary of M&T Bank. I am seeking an investigation into what I believe is a coordinated scheme involving fraud, misrepresentation, and potential financial crimes and criminal misconduct orchestrated by Wilmington Trust, its advisors, associated attorneys, and Andrew Papoutsis, my father (the Grantor of the trust). Through a complex network of legal and financial professionals, they have created a trust structure that limits my rightful access to trust assets, withheld critical information to negotiate me down in settlement discussions, and pressured me into disadvantageous agreements that have caused me severe financial hardship and ultimately forced me into bankruptcy. I have spent the past 12 months piecing together what has happened and believe I have uncovered significant, broader systemic misconduct.*

*In 2012, M&T Bank, through its subsidiary Wilmington Trust, crafted a trust structure for my father, Andrew Papoutsis, that prioritized its own long-term financial gain over the rights and interests of the beneficiaries it was supposedly there to protect. Papoutsis, a wealthy client with significant assets, was initially drawn to M&T Bank when taking out a loan to purchase a local business, York Sheet Metal. Seeing the opportunity to secure Papoutsis as a lifelong client and gain control of substantial assets after his passing, M&T Bank and Wilmington Trust marketed a trust product to Papoutsis that allowed him to enjoy all the benefits of placing his assets in trust without relinquishing control. Using local attorney Alex Snyder of Barley Snyder, Papoutsis presented a meticulously crafted trust agreement, a key tool designed by M&T Bank and Wilmington Trust. This trust structure was leveraged to facilitate financial maneuvers that appeared to perpetuate control over the assets, allowing Papoutsis to manage and leverage them as though they remained under his personal ownership—raising serious concerns about potential financial fraud. However, the trust terms mandate that upon Papoutsis's death, all of his businesses must be liquidated and converted to cash, thus securing a massive inflow of capital for Wilmington Trust to manage. This arrangement allowed M&T Bank not only to capture Papoutsis's assets during his lifetime but also to position itself as the de facto custodian of his wealth in perpetuity, as his children would likely leave the newly liquidated millions in the bank's investment services. In effect, Wilmington Trust's motive was clear: by designing a trust that appeared to benefit Papoutsis's family, they created a vehicle to retain and control his wealth indefinitely. This structure reduced their customer acquisition costs while ensuring a profitable, long-term client relationship across generations.*

*The motives of Wilmington Trust and M&T Bank in structuring Papoutsis's trust extend to a broader network of local attorneys and advisors who profit significantly from the high-net-worth trust and estate planning business. Attorneys Alex Snyder of Barley Snyder, McGregor Brillhart of Stock and Leader, and Bradley Leber of MPL Law have positioned themselves in this field not only because it is lucrative but also because it provides steady access to a wealthy client network. Wilmington Trust's business model thrives on referrals within affluent circles—wealthy clients like Papoutsis know other wealthy individuals and introduce them to trusted advisors. By working with Wilmington Trust, these attorneys have tapped into an ongoing stream of high-net-worth clients, building profitable relationships through the creation and maintenance of complex trusts that require continual legal oversight and generate substantial fees.*

*However, the high rewards of this business come with high risks. When problems arise within these trusts, such as in this case, these advisors are faced with the need to protect their own interests. Here, the cover-up has become worse than the crime. To shield their business model from scrutiny, these advisors appear to have coordinated efforts to obstruct my rightful access to trust distributions, effectively preventing me from accessing the funds I am entitled to. This obstruction is not merely to protect Wilmington Trust and Papoutsis but to protect themselves, as exposure of these practices could jeopardize their business and professional standing. Papoutsis is just one of many clients, and preserving the secrecy and control around this trust is essential to maintaining this lucrative practice. By withholding distributions and blocking access to information, they ensure that their role in structuring and administering such trusts goes unquestioned, protecting both themselves and the broader business model that has made this network so profitable."*

---

On Mon, Nov 18, 2024 at 9:07 AM Daniel Atlas <Datlas@dalleyllp.com> wrote:

Irene: first and foremost, I understand your frustration and thank you for hearing them. My chief intention of that phone call was to express as your adviser what the other side was informing me, and the risks that were presented at that time as Kornfeld was threatening to pull back from settlement negotiations. As I repeatedly have stated, settlement decisions are yours alone, but I wanted to inform you of the risks at that time. You expressed that you wanted to take some time to breathe from the situation, but it was still important to discuss the overall matter to be in the best position to respond to the other parties to the settlement term sheet in light of the bankruptcy. Regardless, I apologies if my intentions did not come across well on that call under difficult circumstances.

On the point you raise between settlement and litigation, I will repeat my previous sentiment that the path has been exclusively focused on settlement because we signed a settlement term sheet. You do not continue to litigate a matter where you sign a settlement term sheet; the point of the document is to focus your attention on completing the deal, not expending further efforts on litigation.

Also, per your request, attached is a copy of a high-level summary of the litigation for your review. I think this details the important key dates in the litigation, the key dates and correspondence in the negotiations (as discussed below, I don't want to divulge too much at this time to the trustee based on up-in-the-air attorney client privilege issues), and most importantly, it clearly states what was left to be negotiated to the term sheet, how it had not been agreed to, and no one signed it.

As discussed above, a point we had not previously discussed because I had not previously known whether you had been in contact with the trustee. It is unclear to me how the trustee will handle your attorney-client privileged communications in this matter. Based on a quick review of relevant case law, a trustee can attempt to waive that privilege on a case-by-case basis. I would recommend for now not divulging information shared pursuant to our communications. I plan to raise this issue with the trustee when we speak to have more clear guidance moving forward through the proceedings.

Finally, I have no issues with you sending your email and, frankly, would prefer it. Like you said, I also value our working relationship as we work to resolve this matter in the best possible way forward for you, so I am happy to have frank/"harsh" conversations as need be to discuss thorny subjects, clear the air and get action items on the table to keep things progressing. I appreciate you sending the email and hope it helped.

Let me know if you have any further questions, thanks
Dan

**Daniel Atlas**
Dalley LLP
1201 N Orange St., | Suite 7300 | Wilmington, DE 19801
T: (302) 468-5026 | datlas@DalleyLLP.com

> **From:** Irene Mulkerin <irene.papoutsis@gmail.com>
> **Sent:** Friday, November 15, 2024 6:25 PM
> **To:** Daniel Atlas <Datlas@dalleyllp.com>
> **Subject:** Re: Request for Detailed Case Summary
>
> Hey Dan,
>
> I understand the need to communicate with the trustee directly to ensure compliance with bankruptcy laws, but first I wanted to express some concerns about our recent interactions.
>
> On October 28th (it was Henry's 9th birthday), you adamantly requested a call repeatedly against my wishes. On that call, you strongly urged me to sign the settlement, despite me repeatedly and heatedly telling you not only that I wasn't signing anything without bankruptcy counsel because I knew I knew nothing about bankruptcy procedures BUT -- more importantly -- I expressed my concerns about the lack of a specific payment date and because I believe the grantor copy is significant new information, and I have not had my questions properly answered yet. It felt like compliance with bankruptcy rules wasn't on your mind at the time and that my objections were not fully considered during that conversation. Frankly, I've felt that the focus has been too heavily on the settlement before and keep trying to push me into a settlement that I do not agree to. I believe it is important to revisit the litigation strategy.
>
> Regarding your request to communicate with the trustee, I would prefer to wait until you have prepared the case summary I requested earlier. Once I have had the opportunity to review it and ensure its accuracy, I will introduce you to the trustee, Steven Carr, via email. Once I do, please include me on all correspondence so I can be sure I know what's going on until I find a lawyer here.
>
> I know the above sounds a bit harsh, but it's been weighing on my mind, and I needed to get this out to ensure my concerns are addressed -- I value our working relationship and want to ensure that we're on the same page.



## Mulkerin Chapter 7 Bankruptcy

5 messages

**Daniel Atlas** <Datlas@daileyllp.com>                                       Thu, Nov 21, 2024 at 6:08 PM
To: "stevecarr8@comcast.net" <stevecarr8@comcast.net>
Cc: Irene Mulkerin <irene.papoutsis@gmail.com>

Mr. Carr: thank you for the call this afternoon to provide an update on the bankruptcy proceedings. I am reaching out because my client has instructed me not to further communicate with you until if/when she retains bankruptcy counsel in this proceeding. As I wrote to her moments ago, I will need direct confirmation of that position from the trustee.

Please advise of your position as to this issue concerning whether I can directly communicate with you and/or provide communications I receive from third parties concerning my client's estate as it concerns either the Delaware litigation/settlement or this bankruptcy.

Have a good evening,

Dan

**Daniel Atlas**

**Dailey** LLP

1201 N Orange St., | Suite 7300 | Wilmington, DE 19801

T: (302) 468-5026 | datlas@DaileyLLP.com

NOTICES: This message, including attachments, is confidential and may contain information protected by the attorney-client privilege or work product doctrine. If you are not the addressee, any disclosure, copying, distribution, or use of the contents of this message are prohibited. If you have received this email in error, please destroy it and notify me immediately. In addition, nothing contained in this message, including attachments, shall be construed as providing tax advice, and is not intended or written to be used for that purpose, or for the purpose of (1) avoiding penalties under the internal revenue code or (2) promoting, marketing, or recommending to others any tax-related matter(s).

**Irene Mulkerin** <irene.papoutsis@gmail.com>                               Thu, Nov 21, 2024 at 6:18 PM
To: Andy Mulkerin <andy.mulkerin.pro-se@outlook.com>

[Quoted text hidden]

**Irene Mulkerin** <irene.papoutsis@gmail.com>                    Thu, Nov 21, 2024 at 8:18 PM
To: Daniel Atlas <datlas@daileyllp.com>
Cc: stevecarr8@comcast.net
Bcc: andy.mulkerin.pro-se@outlook.com

Dan, my directive was not to speak to chernicoff on my behalf until I have an attorney. I requested that all communication between you and Mr. Carr be in writing and me to be cc'ed. I stated that clearly several times. At this point, I am representing myself and I have a right to know what is being discussed.

Sincerely,
Irene Mulkerin

Concision and typos courtesy of on-the-go technology.

On Nov 21, 2024, at 6:08 PM, Daniel Atlas <datlas@daileyllp.com> wrote:

[Quoted text hidden]

**STEVEN CARR** <stevecarr8@comcast.net>                          Fri, Nov 22, 2024 at 8:20 AM
To: Daniel Atlas <Datlas@daileyllp.com>
Cc: "irene.papoutsis@gmail.com" <irene.papoutsis@gmail.com>

The claim is property of the estate.  You must communicate with me.  Ms. Mulkerin has no authority to give you such instructions unless and until I abandon the claim as property of the estate.  Such an action is not imminent.

As for her second email about being cc'ed, again she has no right to make such a demand unless and until I abandon the claim.

Steve
[Quoted text hidden]

**Daniel Atlas** <Datlas@daileyllp.com>                           Fri, Nov 22, 2024 at 8:37 AM
To: STEVEN CARR <stevecarr8@comcast.net>
Cc: "irene.papoutsis@gmail.com" <irene.papoutsis@gmail.com>

Thank you for the confirmation Steve.  Attached is my correspondence yesterday with bankruptcy counsel on behalf of Father/APX companies concerning their settlement proposal.  Please let me know if you would like to discuss this further.

To clarify one point, Mr. Chernicoff mistakenly offers the draft settlement agreement value of $3.1 million. The true figure agreed to is $3.15M. $150,000 currently sits in my firm's escrow account; an additional $3.0 million was to be provided after the agreement's execution.


Best,

Dan


**Daniel Atlas**

**Dailey** LLP

1201 N Orange St., | Suite 7300 | Wilmington, DE 19801

T: (302) 468-5026 | datlas@DaileyLLP.com


[Quoted text hidden]
[Quoted text hidden]


---------- Forwarded message ----------
From: Robert Chernicoff <rec@cclawpc.com>
To: Daniel Atlas <Datlas@daileyllp.com>
Cc: Charles Tiches <CTiches@apx-enclosures.com>, Don Garber <donruns@comcast.net>, Joanne Bartley <jbartley@cclawpc.com>
Bcc:
Date: Thu, 21 Nov 2024 23:00:18 +0000
Subject: RE: Irene Mulkerin

Understood. Thank you for the prompt response.


Robert E. Chernicoff, Esq.

Cunningham, Chernicoff & Warshawsky, PC

2320 N.2nd St.

Harrisburg, PA 17110

717-238-6570

fax 717-238-4809

rec@cclawpc.com

The information contained in this email and attachments is confidential, privileged information and is attorney work product, intended for the individual or entity named above. If the reader of this email is not the intended recipient, the reader is hereby notified that any dissemination, distribution, or copy of this information is strictly prohibited. If you have received this email in error, please notify us by telephone or email and delete the entire email and any printed information obtained through this email. Thank you.

**From:** Daniel Atlas <Datlas@daileyllp.com>
**Sent:** Thursday, November 21, 2024 5:52 PM
**To:** Robert Chernicoff <rec@cclawpc.com>
**Cc:** Charles Tiches <CTiches@apx-enclosures.com>; Don Garber <donruns@comcast.net>; Joanne Bartley <jbartley@cclawpc.com>
**Subject:** RE: Irene Mulkerin

Mr. Chernicoff: I am in receipt of your email. I have passed your clients' settlement proposal to my client; however, I am not the party/principle that has any authority to respond to the proposal. If I have any further information or response to provide, I will do so promptly.

Best,

Dan

**Daniel Atlas**

**Dailey** LLP

1201 N Orange St., | Suite 7300 | Wilmington, DE 19801

T: (302) 468-5026 | datlas@DaileyLLP.com

**From:** Robert Chernicoff <rec@cclawpc.com>
**Sent:** Thursday, November 21, 2024 2:29 PM
**To:** Daniel Atlas <Datlas@daileyllp.com>
**Cc:** Charles Tiches <CTiches@apx-enclosures.com>; Don Kornfield (Don@kornfield.net) <Don@kornfield.net>; Joanne Bartley <jbartley@cclawpc.com>
**Subject:** Irene Mulkerin

This letter constitutes a settlement proposal only in the contents hereof to be considered admissible in any proceeding.

With respect to Ms. Mulkerin's interest in the Papoutsis trust, and the action and pending settlement, we believe that her interest in the settlement based, in part, upon conversion of the trust interest into a contract obligation is property of Ms. Mulkerin's bankruptcy estate. We are prepared to move forward in the Bankruptcy Court to enforce the settlement. We recognize that any litigation in the bankruptcy court may be costly while at the same time, the bankruptcy court is used to moving quickly.

Nonetheless, we do believe that the settlement offer of $3,100,000 is an appropriate settlement given the value of the assets involved. The offer still remains open to settle. Perhaps most importantly, the trust is prepared to pay the sum of $3,100,000 by December 1, 2024. I believe you had expressed previously that one of the concerns is the timing of the pain. This should alleviate this concern. Moving forward on the settlement will avoid potential legal fees or time for Ms. Mulkerin.

I believe that the bankruptcy trustee would agree as to this amount being paid. The only issue becomes the disposition and use of the funds in the bankruptcy. That is the subject for further discussion.

You should also understand, as I'm sure you do, that any interest that Ms. Mulkerin may have in the family Limited partnership is definitely property of the bankruptcy estate to be utilized first to pay creditors. This all may assist her with her financial problems.

Please reply regarding this proposal at your earliest convenience.

Robert E. Chernicoff, Esq.

Cunningham, Chernicoff & Warshawsky, PC

2320 N.2nd St.

Harrisburg, PA 17110

717-238-6570

fax 717-238-4809

rec@cclawpc.com

The information contained in this email and attachments is confidential, privileged information and is attorney work product, intended for the individual or entity named above. If the reader of this email is not the intended recipient, the reader

**Subject:** Re: Update on LP Interest and Trust Litigation
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/22/24, 7:49 AM
**To:** Steven Carr <carr20@aol.com>, "stevecarr8@comcast.net" <stevecarr8@comcast.net>
**BCC:** Irene Mulkerin <irene.papoutsis@gmail.com>, "andy.mulkerin.pro–se@outlook.com"
<andy.mulkerin.pro–se@outlook.com>

Dear Mr. Carr,

Thank you for the update and for your continued efforts in managing the liquidation of the limited partnership interest and the trust litigation.

I have some concerns regarding the proposed sale of the limited partnership interest. Given the significant value of this asset, I want to ensure that it is being marketed properly to achieve the best possible outcome for the estate and my creditors. Could you please provide detailed information on how the asset has been marketed, including the brokers or potential buyers involved, and the basis for determining its value so quickly?

I am also concerned about accepting a potentially low offer without thoroughly exploring all avenues to maximize its value. As Trustee, I understand that you have a fiduciary duty to maximize the value of the estate for the benefit of all creditors, and I want to make sure that all appropriate steps are being taken to fulfill this obligation. I believe that further efforts should be made to market the asset more effectively, perhaps by engaging additional brokers or exploring alternative strategies.

To be clear, I do not agree with proceeding with a rapid sale of the limited partnership interest at this time, especially at a potentially undervalued price. I believe that any sale should be conducted in a manner that is fair and in the best interest of all parties involved. As such, I understand that any proposed sale would require approval from Judge Van Eck, who will ultimately decide what is fair and appropriate.

I want to ensure that the litigation process is being handled appropriately. While I recognize your communication with Attorney Atlas, I would like to better understand the legal basis for managing the litigation exclusively without my input, particularly given that the outcome directly impacts my significant interests. Additionally, on what grounds do you assert that he is not obligated to provide the information I requested on November 20, 2024?

Best,

Irene

---

**From:** Steven Carr <carr20@aol.com>
**Sent:** Thursday, November 21, 2024 3:36 PM
**To:** irene.mulkerin@outlook.com <irene.mulkerin@outlook.com>
**Subject:**

Ms. Mulkerin:

I have received an offer of $300,000.00 for your limited partnership interest. I have rejected that and countered with

**Subject:** Re: Update on LP Interest and Trust Litigation
**From:** Steven Carr <carr20@aol.com>
**Date:** 11/22/24, 9:24 AM
**To:** irene.mulkerin@outlook.com

Ms. Mulkerin:

The moment you filed bankruptcy, your assets became property of the bankruptcy estate.   Thus, you no longer have any right or authority to sell, manage, or control any of the assets.  That includes litigation. Rather, the power to sell, manage, and control vests in me as trustee.

Because of the somewhat unique circumstance of the case wherein it appears that the value of the property of the estate exceeds the amount of debt that you owe, I allowed you to express an opinion as to what asset I should liquidate first.  My expectation was that I would then abandon the remaining assets as surplus, which would have the effect of restoring ownership and control of those assets to you.

You requested that I attempt to liquidate the limited partnership interest before attempting to liquidate the trust litigation.  In response to that request, I cautioned you that selling limited partnership interests is a difficult endeavor because of the peculiarities of limited partnerships, and especially interests that do not generate cash but generate tax liabilities. I will tell you that I was unsuccessful in interesting a broker in taking on the marketing of the interest in the event I was unable to obtain an offer from the co-partners. The reason is that they felt the asset was unmarketable.

Regardless, as per the terms of the limited partnership agreement, I first offered the interest to the other partners.   My valuation in my offer was based upon the stated capital account balance, which valuation for purposes of the offer to the co-partners was as good as any valuation.   That resulted in the $300,000.00 counter-offer that I disclosed to you yesterday.

I repeat that I am inclined to accept whatever offer is contained in the response to my counter.  BUT I am willing to abandon my effort to liquidate the partnership interest and turn my attention to the trust litigation if that is now your preference in light of the amount being offered.

I am merely continuing to extend to you a courtesy to express a preference on the order of liquidation, nothing more. As I also pointed out yesterday, the liquidation of the partnership interest does not appear to solve the mortgage problem...which is why I think that the trust litigation is the better route for your personal interests. Either way, the creditors get paid, and that is my concern.  So unless you tell me to change course, I will continue with my efforts to liquidate the partnership interest and keep the trust litigation on hold.

**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA  17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged.  This message may also be privileged and attorney work product.  It is intended for the individual or entity named above.  If you are not the intended recipient, please do not read, copy, use or disclose this communication to others.   You are notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

In a message dated 11/22/2024 7:49:53 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

**Subject: Re: Update on LP Interest and Trust Litigation**
**From:** Irene Mulkerin <irene.papoutsis@gmail.com>
**Date:** 11/22/24, 10:05 AM
**To:** Irene Mulkerin <irene.mulkerin@outlook.com>

Mr Carr,

In our meeting, I provided you with several documents, including tax returns, K–1s, appraisals and proof–of–sale of a building belonging to the trust. It is your duty to thoroughly and accurately assess the state of my estate, and even a cursory look at 2021 alone (as I have only been given 2020 and 2021 FLP returns), you would see that there was a **$1.011M distribution**, yet as a 32% owner of that partnership, I received $0. I believe it is not only within your rights, but it is your duty, to maximize the value of my estate. Also, in unusual circumstances when fraud or other factors would make my share unsaleable, you may elect to dissolve the partnership. The assets of just the 3 industrial buildings is over $8M and that does not include any profits and distributions that have never been made to me.

On Fri, Nov 22, 2024 at 9:41AM Irene Mulkerin <irene.mulkerin@outlook.com> wrote:
Latest
Get Outlook for iOS

---

**From:** Steven Carr <carr20@aol.com>
**Sent:** Friday, November 22, 2024 9:24 AM
**To:** irene.mulkerin@outlook.com <irene.mulkerin@outlook.com>
**Subject:** Re: Update on LP Interest and Trust Litigation

Ms. Mulkerin:

The moment you filed bankruptcy, your assets became property of the bankruptcy estate. Thus, you no longer have any right or authority to sell, manage, or control any of the assets. That includes litigation. Rather, the power to sell, manage, and control vests in me as trustee.

Because of the somewhat unique circumstance of the case wherein it appears that the value of the property of the estate exceeds the amount of debt that you owe, I allowed you to express an opinion as to what asset I should liquidate first. My expectation was that I would then abandon the remaining assets as surplus, which would have the effect of restoring ownership and control of those assets to you.

You requested that I attempt to liquidate the limited partnership interest before attempting to liquidate the trust litigation. In response to that request, I cautioned you that selling limited partnership interests is a difficult endeavor because of the peculiarities of limited partnerships, and especially interests that do not generate cash but generate tax liabilities. I will tell you that I was unsuccessful in interesting a broker in taking on the marketing of the interest in the event I was unable to obtain an offer from the co-partners. The reason is that they felt the asset was unmarketable.

Regardless, as per the terms of the limited partnership agreement, I first offered the interest to the other partners. My valuation in my offer was based upon the stated capital account balance, which valuation for purposes of the offer to the co-partners was as good as any valuation. That resulted in the $300,000.00 counter-offer that I disclosed to you yesterday.

I repeat that I am inclined to accept whatever offer is contained in the response to my counter. BUT I am willing to abandon my effort to liquidate the partnership interest and turn my attention to the trust litigation if that is now your preference in light of the amount being offered.

**From:** Steven Carr <carr20@aol.com>
**Date:** 11/25/24, 9:59 AM
**To:** irene.mulkerin@outlook.com

Ms. Mulkerin:

In follow up to my email of November 22, 2024, given that you have not expressed a preference that I pursue the settlement of the trust litigation, I will proceed with accepting the $500,000.00 offer for your limited partnership interest.


**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA  17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged.  This message may also be privileged and attorney work product.  It is intended for the individual or entity named above.  If you are not the intended recipient, please do not read, copy, use or disclose this communication to others.   You are notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

1 of 1

Case 1:24-bk-02752-HWV    Doc 55    Filed 12/04/24    Entered 12/04/24 15:36:31    Desc
Main Document      Page 39 of 51                        12/4/24, 12:10 PM

**Subject:** Objection to FLP Sale and Request for Information
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/25/24, 11:13 AM
**To:** Steven Carr <carr20@aol.com>, "stevecarr8@comcast.net" <stevecarr8@comcast.net>
**CC:** "andy.mulkerin.pro-se@outlook.com" <andy.mulkerin.pro-se@outlook.com>, Irene Mulkerin <irene.papoutsis@gmail.com>

Dear Mr. Carr,

I am writing to formally object to the proposed acceptance of the $500,000 offer for my interest in the Andrew V. Papoutsis Family Limited Partnership (FLP).

As we previously discussed, I believe this offer significantly undervalues my interest in the Family Limited Partnership (FLP). The partnership holds substantial assets, including real estate valued between $10–12 million, as well as considerable cash reserves. I have already provided evidence supporting a higher valuation, including appraisals, sales records, K-1 documents, and partnership tax returns, which reveal several millions in unexplained distributions.

Before any further action is taken, I respectfully request the following:

1. **Detailed Valuation Information:**
   - Please provide a comprehensive explanation of how the $500,000 offer was determined.
   - Include any appraisals, valuations, or assessments conducted to arrive at this figure.
   - Please provide a detailed list of all documents requested, including who the requests were directed to, the nature of the documents requested, and the outcomes of those requests. As I have previously indicated, and continue to emphasize, there is an extremely high likelihood of fraud, potentially on a large scale, that you need to be fully aware of and consider. This information is critical to ensuring a thorough and accurate assessment of the situation.
   - For the documents you did receive—including those I provided to you electronically and during our in-person meeting when my husband and I came to your office at 9:30 a.m. on Monday, November 11—did you thoroughly review them? Please provide an explanation of how these documents were considered in your analysis and how they informed your decision-making process, particularly as it relates to this rushed "fire sale" approach, which appears to prioritize benefiting my creditors over maximizing the value of my estate.
   - Outline the efforts made to market the FLP interest and any other offers or inquiries received.
   - Please provide a detailed outline of any and all efforts undertaken to recover the $1.4 million or any of the other cash assets associated with this matter. Include the steps taken, parties involved, and any outcomes or ongoing actions related to these recovery efforts.

2. **Disclosure of Potential Conflicts of Interest:**
   - Given what I would describe as very odd behavior in administering my bankruptcy case as the trustee, I have to ask politely but firmly: Are you acquainted with or in communication or cooperation with any of the following individuals?
     - Bradley Leber, Esq.
     - McGregor Brillhart, Esq.
     - Alex Snyder, Esq.
   - I believe you have a duty to identify any conflicts. Please do so immediately.

3. **Review of Additional Information:**
   - My husband, Andy Mulkerin, sent you an email this morning outlining potential opportunities to maximize the value of my estate. I have attached his email for your reference.
   - I request that you review his suggestions and consider them in your assessment. He is available to discuss these points with you directly if that would be helpful.
   - Additionally, I have not received any response from you regarding the concerns I outlined in my email to you on Thursday, November 21, 2024. These concerns pertain to the litigation and valuation of the estate asset TT/Papoutsis Family Trust, deeded on December 13, 2012, as well as a draft complaint introduction highlighting significant issues of potential fraud and misconduct related to my case.
   - Whether or not you believe the information is relevant, I do, and I am confident that Judge Van Eck will find it relevant as well. Please review the information carefully. For your convenience, I have reiterated many of my current concerns on the matter below, as I trust you will recall.

Irene Mulkerin

↩Reply

↩Reply all

↪Forward

To:Steven Carr

Thu 11/21/2024 10:57 AM

High importance

You forwarded this message on Thu 11/21/2024 3:18 PM

Dear Mr. Carr,

I hope your week has been going well. I wanted to provide a brief update regarding my attorney, as I'm feeling quite frustrated with his handling of my concerns at the moment. While I know you can't offer legal advice, see below, he wants to talk to you directly, so I wanted to ensure you have the right context for anything Dan might discuss with you. I apologize that I said that you wanted a case summary (I know you didn't ask for that) but I have been having a lot of trouble getting him to address my issues.

Thank you so much!

Best,
Irene

--------- Forwarded message ---------
From: Irene Mulkerin <irene.papoutsis@gmail.com>
Date: Thu, Nov 21, 2024 at 10:36 AM
Subject: Re: Request for Detailed Case Summary
To: Daniel Atlas <datlas@dalleyllp.com>

Hey Dan,

If you feel you need to reach out to the trustee, I understand and pls include me in all correspondence (keep it written). However, I want to be clear that I DO NOT want you from going on the call with Chernoff. Participating in that call, even in listening mode, is detrimental to my interests. Anything they have to say regarding offers or negotiations needs to be put in writing, and I expect them to do so.

**Subject:** Re: Objection to FLP Sale and Request for Information
**From:** Irene Mulkerin <irene.mulkerin@outlook.com>
**Date:** 11/25/24, 11:26 AM
**To:** Steven Carr <carr20@aol.com>, "stevecarr8@comcast.net" <stevecarr8@comcast.net>
**CC:** "andy.mulkerin.pro-se@outlook.com" <andy.mulkerin.pro-se@outlook.com>, Irene Mulkerin <irene.papoutsis@gmail.com>

Apologies, here is the correct thread that does outline my objections so those can be addressed. -Irene

------------------

Dear Mr. Carr,

I hope your week has been going well. I wanted to provide a brief update regarding my attorney, as I'm feeling quite frustrated with his handling of my concerns at the moment. While I know you can't offer legal advice, see below, he wants to talk to you directly, so I wanted to ensure you have the right context for anything Dan might discuss with you. I apologize that I said that you wanted a case summary (I know you didn't ask for that) but I have been having a lot of trouble getting him to address my issues.

Thank you so much!

Best,
Irene

---------- Forwarded message ---------
**From:** Irene Mulkerin <irene.papoutsis@gmail.com>
**Date:** Thu, Nov 21, 2024 at 10:36 AM
**Subject:** Re: Request for Detailed Case Summary
**To:** Daniel Atlas <datlas@daileyflp.com>

## Hey Dan,

If you feel you need to reach out to the trustee, I understand and pls include me in all correspondence (keep it written). However, I want to be clear that I DO NOT want you from going on the call with Chernoff. Participating in that call, even in listening mode, is detrimental to my interests. Anything they have to say regarding offers or negotiations needs to be put in writing, and I expect them to do so.

Please focus on addressing my email seriously and making that the priority vs chasing more crooked lawyers around. Let's focus on the critical items I've outlined instead of diverting attention to more bs.

Let me know where things stand on the items we've discussed.

Sincerely,
Irene Mulkerin

Concision and typos courtesy of on-the-go technology.

On Nov 21, 2024, at 10:20 AM, Daniel Atlas <datlas@daileyflp.com> wrote:

Irene: as previously stated, I can take no further action with regards to the settlement and the litigation without speaking directly with the Trustee. You stated that the trustee requested a high-level summary of the litigation; that is what I provided. The time is now for me to reach out to the Trustee; I plan on doing so today, and will cc you on that correspondence.

This action is necessary because, based on your email, there is significant confusion about the current state of affairs. You state that the Trustee "is currently focused on liquidating the LP assets." The trustee would have no such authority to do so. The assets in the LP are not yours, they are held by the LP, which your father manages as the General Partner. I see no basis on why the Trustee would be focusing on the LP in the context of your Chapter 7 Bankruptcy. There appears to be confusion that needs to be clarified.

Finally, bankruptcy counsel for your father/APX reached out to me last night about having a call this afternoon ("You have time tomorrow to talk around 2 PM I should have a great deal of information to provide to you and a possible resolution"). I will join that call this afternoon purely in listening mode to see what he has to say, but making quite clear that I have no authority to respond on any point he may raise. I am copying you on my correspondence with him.

Best,
Dan

---------- Forwarded message ---------
**From:** Irene Mulkerin <irene.papoutsis@gmail.com>
**Date:** Wed, Nov 20, 2024 at 4:05 PM
**Subject:** Re: Request for Detailed Case Summary
**To:** Daniel Atlas <Datlas@daileyflp.com>

Hey Dan,

Thanks for your email. I hope we can use this opportunity to realign our efforts, address the pressing issues comprehensively, and regain momentum to ensure the best possible outcome. Before deciding whether proceed, I need to clarify several critical points. As you've noted, the decision ultimately rests with me, and Mr. Carr, the trustee in my bankruptcy case, has indicated he can weigh in when appropriate but is currently focused on liquidating the LP assets. While I do not yet have a bankruptcy attorney, Mr. Carr's plan gives us time to reassess, act more deliberately and carefully consider whether to continue settlement discussions or move forward with litigation.

Things I need in order to do that:

1. The more I've reflected on this, the missing Schedule A from the original doc has become increasingly clear as a critical piece of the puzzle. This document is essential for understanding the valuation of the companies at the time they were placed into the trust. (Please request it directly from Wilmington Trust's counsel.)

2. Also, before speaking with Jen, I want her to have all the York Sheet Metal financial documents I sent you in March to ensure she has the necessary context to provide her opinion. As I've emphasized before, I want Dailey LLP to formally engage Jen on my behalf to effectively advance this matter. The financial documents I sent you in March, show York Sheet Metal shareholder distributions totaling millions of dollar.

3. Finally, I'd like a list of all documents I am legally entitled to and a phase plan to request them from the appropriate parties. These additional materials will either strengthen our negotiating leverage or bolster our trial position, depending on what we uncover. This effort is crucial to fully understand how the fraud was structured and the extent of any breaches or misconduct.

4. Laura's decanted trust mirrors the original trust and Jamie's trust but consists of cash rather than assets. She does not have access to funds beyond what any of us had during the past 12 years. I know this arrangement predates the term sheet (which was wrong in the summary you sent me) and I now see it was a deliberate and successful attempt to lower my settlement number. They manipulated me again. I was informed this transaction was tied directly to reducing my valuation. I need you to review your notes and provide the exact date you were informed of this, along with any supporting details, as I recall you telling me on the phone. This is a critical point, and I want to ensure we pin it down as precisely.

5. While I appreciate the effort you've made in outlining some of the key dates and information for the Trustee, what I need is a comprehensive case summary that details the background of the litigation and negotiations, explaining how we arrived at the current settlement. Please address the strategies we've explored, the paths we set aside, and the rationale behind each. Additionally, I need an updated analysis of the options now available, particularly considering the bankruptcy filing and the additional time it affords us to act strategically.

6. I know this is a contingency case, but I would appreciate a summary of the hours you and your team have invested. Understanding the effort put into this case provides important context as we proceed.

7. In May/June, I agreed to focus on settlement because I was under severe financial pressure. However, bankruptcy has alleviated the immediate strain. The delays and obfuscations have clearly benefited the other side, and we need to shift gears to protect my interests. They've successfully controlled this process and systematically squeezed me down to where we are now. While I understand that you previously said you didn't believe this was the case for whatever reason, I think if you take a step back and look at it objectively, you'll see it's quite clear.

8. As I continue to piece together what has happened—and what is still ongoing—I am increasingly convinced that the trust protectors and distribution advisors are deeply involved wrong-doing, yet they are not named defendants in our complaint. Their actions and timing strongly suggest coordinated misconduct that demands scrutiny.

9. A pivotal realization for me was understanding the broader motive behind Wilmington Trust's actions. Their ultimate strategy seems to revolve around lowering their customer acquisition costs by effectively capturing a wealthy client's estate in perpetuity. This is achieved by securing long-term control of assets (often through the mandated sale of closely held businesses upon the grantor's death), ensuring a substantial inflow of capital for their management. This trust structure allows the client, in this case my father, to enjoy the benefits of control and wealth during his lifetime while guaranteeing that the assets transfer to Wilmington Trust's control upon his passing. For them, this arrangement is highly lucrative—it secures a profitable client relationship across generations with minimal effort.

This is a substantial case with high stakes for both me and your firm. It's time to take a more assertive and comprehensive approach to achieve the best possible outcome. Let me know if you need clarification on anything outlined here.

Thanks so much!

Irene

---

**Draft Complaint Introduction for your thoughts**

*"I am a beneficiary of an irrevocable trust managed by Wilmington Trust, a subsidiary of M&T Bank. I am seeking an investigation into what I believe is a coordinated scheme involving fraud, misrepresentation, and potential financial crimes and criminal misconduct orchestrated by Wilmington Trust, its advisors, associated attorneys, and Andrew Papoutsis, my father (the Grantor of the trust). Through a complex network of legal and financial professionals, they have created a trust structure that limits my rightful access to trust assets, withheld critical information to negotiate me down in settlement discussions, and pressured me into disadvantageous agreements that have caused me severe financial hardship and ultimately forced me into bankruptcy. I have spent the past 12 months piecing together what has happened and believe I have uncovered significant, broader systemic misconduct.*

*In 2012, M&T Bank, through its subsidiary Wilmington Trust, crafted a trust structure for my father, Andrew Papoutsis, that prioritized its own long-term financial gain over the rights and interests of the beneficiaries it was supposedly there to protect. Papoutsis, a wealthy client with significant assets, was initially drawn to M&T Bank when taking out a loan to purchase a local business, York Sheet Metal. Seeing the opportunity to secure Papoutsis as a lifelong client and gain control of substantial assets after his passing, M&T Bank and Wilmington Trust marketed a trust product to Papoutsis that allowed him to enjoy all the benefits of placing his assets in trust without relinquishing control. Using local attorney Alex Snyder of Barley Snyder, Papoutsis prepared a meticulously crafted trust agreement, a key tool designed by M&T Bank and Wilmington Trust. This trust structure was leveraged to facilitate financial maneuvers that appeared to perpetuate control over the assets, allowing Papoutsis to manage and leverage them as though they remained under his personal ownership—raising serious concerns about potential financial fraud. However, the trust terms mandate that upon Papoutsis's death, all of his businesses must be liquidated and converted to cash, thus securing a massive inflow of capital for Wilmington Trust to manage. This arrangement allowed M&T Bank not only to capture Papoutsis's assets during his lifetime but also to position itself as the de facto custodian of his wealth in perpetuity, as his children would likely leave the newly liquidated millions in the bank's investment services. In effect, Wilmington Trust's motive was clear: by designing a trust that appeared to benefit Papoutsis's family, they created a vehicle to retain and control his wealth indefinitely. This structure reduced their customer acquisition costs while ensuring a profitable, long-term client relationship across generations.*

*The motives of Wilmington Trust and M&T Bank in structuring Papoutsis's trust extend to a broader network of local attorneys and advisors who profit significantly from the high-net-worth trust and estate planning business. Attorneys Alex Snyder of Barley Snyder, McGregor Brillhart of Stock and Leader, and Bradley Leber of MPL Law have positioned themselves in this field not only because it is lucrative but also because it provides steady access to a wealthy client network. Wilmington Trust's business model thrives on referrals within affluent circles—wealthy clients like Papoutsis know other wealthy individuals and introduce them to trusted advisors. By working with Wilmington Trust, these attorneys have tapped into an ongoing stream of high-net-worth clients, building profitable relationships through the creation and maintenance of complex trusts that require continual legal oversight and generate substantial fees.*

*However, the high rewards of this business come with high risks. When problems arise within these trusts, such as in this case, these advisors are faced with the need to protect their own interests. Here, the cover-up has become worse than the crime. To shield their business model from scrutiny, these advisors appear to have coordinated efforts to obstruct my rightful access to trust distributions, effectively preventing me from accessing the funds I am entitled to. This obstruction is not merely to protect Wilmington Trust and Papoutsis but to protect themselves, as exposure of these practices could jeopardize their business and professional standing. Papoutsis is just one of many clients, and preserving the secrecy and control around this trust is essential to maintaining their lucrative practice. By withholding distributions and blocking access to information, they ensure that their role in structuring and administering such trusts goes unquestioned, protecting both themselves and the broader business model that has made this network so profitable."*

---

On Mon, Nov 18, 2024 at 9:07 AM Daniel Atlas <Datlas@dalleyllp.com> wrote:

Irene: first and foremost, I understand your frustration and thank you for sharing them. My chief intention of that phone call was to express as your adviser what the other side was informing me, and the risks that were presented at that time as Kornfeld was threatening to pull back from settlement negotiations. As I repeatedly have stated, settlement decisions are yours alone, but I wanted to inform you of the risks at that time. You expressed that you wanted to take some time to breathe from the situation, but it was still important to discuss the overall matter to be in the best position to respond to the other parties to the settlement term sheet in light of the bankruptcy. Regardless, I apologize if my intentions did not come across well on that call under difficult circumstances.

On the point you raise between settlement and litigation lines, I will repeat my previous sentiment that the path has been exclusively focused on settlement because we signed a settlement term sheet. You do not continue to litigate a matter where you sign a settlement term sheet; the point of the document is to focus your attention on completing the deal, not expending further efforts on litigation.

Also, per your request, attached is a copy of a high-level summary of the litigation for your review. I think this details the important key dates in the litigation, the key dates and correspondence in the negotiations (as discussed below, I don't want to divulge too much at this time to the trustee based on up-in-the-air attorney client privilege issues), and most importantly, it clearly states what was left to be negotiated to the term sheet, how it had not been agreed to, and no one signed it.

As discussed above, a point we had not previously discussed because I had not previously known whether you had been in contact with the trustee. It is unclear to me how the trustee will handle your attorney-client privileged communications in this matter. Based on a quick review of relevant case law, a trustee can attempt to waive that privilege on a case-by-case basis. I would recommend for now not divulging information shared pursuant to our communications. I plan to raise this issue with the trustee when we speak to have more clear guidance moving forward through the proceedings.

Finally, I have no issues with you sending your email and, frankly, would prefer it. Like you said, I also value our working relationship as we work to resolve this matter in the best possible way forward for you, so I am happy to have frank/"harsh" conversations as need be to discuss thorny subjects, clear the air and get action items on the table to keep things progressing. I appreciate you sending the email and hope it helped.

Let me know if you have any further questions, thanks
Dan

**Daniel Atlas**
**Dalley LLP**
1201 N Orange St., | Suite 7300 | Wilmington, DE 19801
T: (302) 468-5026 | datlas@DalleyLLP.com

**From:** Irene Mulkerin <irene.papoutsis@gmail.com>
**Sent:** Friday, November 15, 2024 6:25 PM
**To:** Daniel Atlas <Datlas@dalleyllp.com>
**Subject:** Re: Request for Detailed Case Summary

Hey Dan,

I understand the need to communicate with the trustee directly to ensure compliance with bankruptcy laws, but first I wanted to express some concerns about our recent interactions.

On October 28th (it was Henry's 9th birthday), you adamantly requested a call repeatedly against my wishes. On that call, you strongly urged me to sign the settlement, despite me repeatedly and heatedly telling you not only that I wasn't signing anything without bankruptcy counsel because I knew I knew nothing about bankruptcy procedures BUT—more importantly—I expressed my concerns about the lack of a specific payment date and because I believe the grantor copy is significant new information, and I have not had my questions properly answered yet. It felt like compliance with bankruptcy rules wasn't on your mind at the time and that my objections were not fully considered during that conversation. Frankly, I've felt that the focus has been too heavily on the settlement path for some time now, as I've mentioned before and keep trying to push me into a settlement that I do not agree to. I believe it is important to revisit the litigation strategy.

Regarding your request to communicate with the trustee, I would prefer to wait until you have prepared the case summary I requested earlier. Once I have had the opportunity to review it and ensure its accuracy, I will

Introduce you to the trustee, Steven Carr, via email. Once I do, please include me on all correspondence so I can be sure I know what's going on until I find a lawyer here.

I know the above sounds a bit harsh, but it's been weighing on my mind, and I needed to get this out to ensure my concerns are addressed -- I value our working relationship and want to ensure that we're on the same page.

Thanks so much, and have a great weekend!

Irene

On Fri, Nov 15, 2024 at 3:53 PM Daniel Atlas <Datlas@daileyllo.com> wrote:

That's great news Irene. Unfortunately, I will need to communicate with the trustee directly on this issue to be able to proceed. Bankruptcy laws concerning automatic stays are incredibly restrictive, and courts impose punitive damages/penalties to those who take action in violation of the stay. Accordingly, I need further confirmation directly from the trustee.

Please let me know if you would like to coordinate that introduction or have me reach out to Mr. Carr directly.

Have a good weekend,
Dan

Daniel Atlas
Dailey LLP
1201 N Orange St., | Suite 7300 | Wilmington, DE 19801
T: (302) 468-5026 | datlas@DaileyLLP.com

From: Irene Mulkerin <irene.papoutsis@gmail.com>
Sent: Friday, November 15, 2024 2:21 PM
To: Daniel Atlas <Datlas@daileyllo.com>
Subject: Re: Request for Detailed Case Summary

Hi Dan,

I wanted to let you know that the trustee in my bankruptcy case has given the all-clear for settlement discussions with the Trust to continue. In light of this, I would appreciate it if you could press for the bank information immediately to help move the process forward. Additionally, I still need a clear and detailed response to the financial and tax issues related to the Grantor Copy and the company finances from Jen or someone qualified to evaluate this properly (this is very important to me).

Thanks so much let me know when you have any updates.

Irene

On Thu, Nov 14, 2024 at 12:12 PM Irene Mulkerin <irene.papoutsis@gmail.com> wrote:

Thanks so much for preparing the case summary. The trustee recommended that I get a comprehensive case summary from you to help me navigate the complexities of the case, particularly given my inability to find counsel thus far and the continued pressure to settle in an effort to help me be better prepared to find an attorney.

At this time, I'd prefer to keep correspondence between us, so there's no need to reach out to the trustee on this point. Along with the case summary, could you also include a breakdown of all major case actions and a summary of any notable correspondence with the opposing side? Pls include key details on the negotiation history and any developments related to the settlement discussions, especially any instances where I did not formally agree to terms, as the opposing side is asserting. This would help reinforce that I have not agreed to settle, which is important.

Thanks so much,

Irene

On Thu, Nov 14, 2024 at 11:27 AM Daniel Atlas <Datlas@daileyllo.com> wrote:

Irene: happy to provide. I have a filing today I'm working on, but can draft tonight.

Do you have any written correspondence with the trustee on this point that you can provide for more clarity? If not, can I email him (cc'ing you) to make an introduction and inquire further? Would prefer to get it right the first time/cut out any back and forth delay.

Daniel Atlas
Dailey LLP
1201 N Orange St., | Suite 7300 | Wilmington, DE 19801
T: (302) 468-5026 | datlas@DaileyLLP.com

From: Irene Mulkerin <irene.papoutsis@gmail.com>
Sent: Thursday, November 14, 2024 11:21 AM
To: Daniel Atlas <Datlas@daileyllo.com>
Subject: Request for Detailed Case Summary

Hey Dan,

I wanted to follow up on an action item from my meeting with the bankruptcy trustee. One of the steps we discussed was obtaining a detailed summary of my case from you. Could you please provide me with a comprehensive case summary? I believe this is necessary for my bankruptcy case.

Thanks so much,

Irene

---

From: Irene Mulkerin <irene.mulkerin@outlook.com>
Sent: Monday, November 25, 2024 11:13 AM
To: Steven Carr <carr20.com>; stevecarr8@comcast.net <stevecarr8@comcast.net>
Cc: andy.mulkerin.pro-se@outlook.com <andy.mulkerin.pro-se@outlook.com>; Irene Mulkerin <irene.papoutsis@gmail.com>
Subject: Objection to FLP Sale and Request for Information

Dear Mr. Carr,

I am writing to formally object to the proposed acceptance of the $500,000 offer for my interest in the Andrew V. Papoutsis Family Limited Partnership (FLP).

As we previously discussed, I believe this offer significantly undervalues my interest in the Family Limited Partnership (FLP). The partnership holds substantial assets, including real estate valued between $10–12 million, as well as considerable cash reserves. I have already provided evidence supporting a higher valuation, including appraisals, sales records, K-1 documents, and partnership tax returns, which reveal millions in unexplained distributions.

Before any further action is taken, I respectfully request the following:

1. Detailed Valuation Information:

Case 1:24-bk-02752-HWV    Doc 55    Filed 12/04/24    Entered 12/04/24 15:36:31    Desc
Main Document    Page 43 of 51

12/4/24, 12:11 PM

- Please provide a comprehensive explanation of how the $500,000 offer was determined.

- Include any appraisals, valuations, or assessments conducted to arrive at this figure.

- Please provide a detailed list of all documents requested, including who the requests were directed to, the nature of the documents requested, and the outcomes of those requests. As I have previously indicated, and continue to emphasize, there is an extremely high likelihood of fraud, potentially on a large scale, that you need to be fully aware of and consider. This information is critical to ensuring a thorough and accurate assessment of the situation.

- For the documents you did receive—including those I provided to you electronically and during our in-person meeting when my husband and I came to your office at 9:30 a.m. on Monday, November 11—did you thoroughly review them? Please provide an explanation of how these documents were considered in your analysis and how they informed your decision-making process, particularly as it relates to this rushed "fire sale" approach, which appears to prioritize benefiting my creditors over maximizing the value of my estate.

- Outline the efforts made to market the FLP interest and any other offers or inquiries received.

- Please provide a detailed outline of any and all efforts undertaken to recover the $1.4 million or any of the other cash assets associated with this matter. Include the steps taken, parties involved, and any outcomes or ongoing actions related to these recovery efforts.

2. Disclosure of Potential Conflicts of Interest:

- Given what I would describe as very odd behavior in administering my bankruptcy case as the trustee, I have to ask politely but firmly: Are you acquainted with or in communication or cooperation with any of the following individuals:

  - Bradley Leber, Esq.

  - McGregor Brillhart, Esq.

  - Alex Snyder, Esq.

- I believe you have a duty to identify any conflicts. Please do so immediately.

3. Review of Additional Information:

- My husband, Andy Mulkerin, sent you an email this morning outlining potential opportunities to maximize the value of my estate. I have attached his email for your reference.

- I request that you review his suggestions and consider them in your assessment. He is available to discuss these points with you directly if that would be helpful.

- Additionally, I have not received any response from you regarding the concerns I outlined in my email to you on Thursday, November 21, 2024. These concerns pertain to the litigation and valuation of the estate asset TI/Papoutsis Family Trust, deeded on December 13, 2012, as well as a draft complaint introduction highlighting significant issues of potential fraud and misconduct related to my case.

- Whether or not you believe the information is relevant, I do, and I am confident that Judge Van Eck will find it relevant as well. Please review the information carefully. For your convenience, I have reiterated many of my current concerns on the matter below, as I trust you will recall.

Irene Mulkerin

⊠Reply

⊠Reply all

⊠Forward

To:Steven Carr

Thu 11/21/2024 10:57 AM

⊠

High Importance

☒

You forwarded this message on Thu 11/21/2024 3:18 PM

Dear Mr. Carr,

I hope your week has been going well. I wanted to provide a brief update regarding my attorney, as I'm feeling quite frustrated with his handling of my concerns at the moment. While I know you can't offer legal advice, see below, he wants to talk to you directly, so I wanted to ensure you have the right context for anything Dan might discuss with you. I apologize that I said that you wanted a case summary (I know you didn't ask for that) but I have been having a lot of trouble getting him to address my issues.

Thank you so much!

Best,
Irene

---------- Forwarded message ----------
From: Irene Mulkerin <irene.papoutsis@gmail.com>
Date: Thu, Nov 21, 2024 at 10:36 AM
Subject: Re: Request for Detailed Case Summary
To: Daniel Atlas <datlas@dailevbio.com>

Hey Dan,

If you feel you need to reach out to the trustee, I understand and pls include me in all correspondence (keep it written). However, I want to be clear that I DO NOT want you from going on the call with Chernoff. Participating in that call, even in listening mode, is detrimental to my interests. Anything they have to say regarding offers or negotiations needs to be put in writing, and I expect them to do so.

Please focus on addressing my email seriously and making that the priority vs chasing more crooked lawyers around. Let's focus on the critical items I've outlined instead of diverting attention to more bs.

Let me know where things stand on the items we've discussed.

Sincerely,

Irene Mulkerin

# Re: Objection to FLP Sale and Request for Information

Concision and typos courtesy of on-the-go technology.

On Nov 21, 2024, at 10:20 AM, Daniel Atlas <datlas@daileyllp.com> wrote:

Irene: as previously stated, I can take no further action with regards to the settlement and the litigation without speaking directly with the Trustee. You stated that the trustee requested a high-level summary of the litigation; that is what I provided. The time is now for me to reach out to the Trustee; I plan on doing so today, and will cc you on that correspondence.

This action is necessary because, based on your email, there is significant confusion about the current state of affairs. You state that the Trustee "is currently focused on liquidating the LP assets." The trustee would have no such authority to do so. The assets in the LP are not yours, they are held by the LP, which your father manages as the General Partner. I see no basis on why the Trustee would be focusing on the LP in the context of your Chapter 7 Bankruptcy. There appears to be confusion that needs to be clarified.

Finally, bankruptcy counsel for your father/APX reached out to me last night about having a call this afternoon ("You have time tomorrow to talk around 2 PM I should have a great deal of information to provide to you and a possible resolution"). I will join that call this afternoon purely in listening mode to see what he has to say, but making quite clear that I have no authority to respond on any point he may raise. I am copying you on my correspondence with him.

Best,

Dan

---------- Forwarded message ----------
From: Irene Mulkerin <irene.papoutsis@gmail.com>
Date: Wed, Nov 20, 2024 at 4:05 PM
Subject: Re: Request for Detailed Case Summary
To: Daniel Atlas <Datlas@daileyllp.com>

Hey Dan,

Thanks for your email. I hope we can use this opportunity to realign our efforts, address the pressing issues comprehensively, and regain momentum to ensure the best possible outcome. Before deciding whether proceed, I need to clarify several critical points. As you've noted, the decision ultimately rests with me, and Mr. Carr, the trustee in my bankruptcy case, has indicated he can weigh in when appropriate but is currently focused on liquidating the LP assets. While I do not yet have a bankruptcy attorney, Mr. Carr's plan gives us time to reassess, act more deliberately and carefully consider whether to continue settlement discussions or move forward with litigation.

Things I need in order to do that:

4. The more I've reflected on this, the missing Schedule A from the original doc has become increasingly clear as a critical piece of the puzzle. This document is essential for understanding the valuation of the companies at the time they were placed into the trust. (Please request it directly from Wilmington Trust's counsel.)

5. Also, before speaking with Jen, I want her to have all the York Steel Metal financial documents I sent you in March to ensure she has the necessary context to provide her opinion. As I've emphasized before, I want Dailey LLP to formally engage Jen on my behalf to effectively advance this matter. The financial documents I sent you in March, show York Sheet Metal shareholder distributions totaling millions of dollar.

6. Finally, I'd like a list of all documents I am legally entitled to and a please plan to request them from the appropriate parties. These additional materials will further strengthen our negotiating leverage or bolster our trial position, depending on what we uncover. This effort is crucial to fully understand how the fraud was structured and the extent of any breaches or misconduct.

7. Laura's decanted trust mirrors the original trust and Jamie's trust but consists of cash rather than assets. She does not have access to funds beyond what any of us had during the past 12 years. I know this arrangement predates the term sheet (which was wrong in the summary you sent me) and I now see it was a deliberate and successful attempt to lower my settlement number. They manipulated me again. I was informed this transaction was tied directly to reducing my valuation. I need you to review your notes and provide the exact date you were informed of this, along with any supporting details, as I recall you telling me on the phone. This is a critical point, and I want to ensure we pin it down precisely.

8. While I appreciate the effort you've made in outlining some of the key dates and information for the Trustee, what I need is a comprehensive case summary that details the background of the litigation and negotiations, explaining how we arrived at the current settlement. Please address the strategies we've explored, the paths we set aside, and the rationale behind each. Additionally, I need an updated analysis of the options now available, particularly considering the bankruptcy filing and the additional time it affords us to act strategically.

9. I know this is a contingency case, but I would appreciate a summary of the hours you and your team have invested. Understanding the effort put into this case provides important context as we proceed.

10. In May/June, I agreed to focus on settlement because I was under severe financial pressure. However, bankruptcy has alleviated the immediate strain. The delays and obfuscations have clearly benefited the other side, and we need to shift gears to protect my interests. They've successfully controlled this process and systematically squeezed me down to where we are now. While I understand that you previously said you didn't believe this was the case for whatever reason, I think if you take a step back and look at it objectively, you'll see it's quite clear.

11. As I continue to piece together what has happened—and what is still unfolding—I am increasingly convinced that the trust protectors and distribution advisors are deeply involved wrong-doing, yet they are not named defendants in our complaint. Their actions and timing strongly suggest coordinated misconduct that demands further scrutiny.

12. A pivotal realization for me was understanding the broader motive behind Wilmington Trust's actions. Their ultimate strategy seems to revolve around lowering their customer acquisition costs by effectively capturing a wealthy client's estate in perpetuity. This is achieved by securing long-term control of assets (often through the mandated sale of closely held businesses upon the grantor's death), ensuring a substantial inflow of capital for their management. This trust structure allows the client, in this case my father, to enjoy the benefits of control and wealth during his lifetime while guaranteeing that the assets transfer to Wilmington Trust's control upon his passing. For them, this arrangement is highly lucrative—it secures a profitable client relationship across generations with minimal effort.

This is a substantial case with high stakes for both me and your firm. It's time to take a more assertive and comprehensive approach to achieve the best possible outcome.

Let me know if you need clarification on anything outlined here.

Thanks so much!

Irene

---

**Draft Complaint Introduction for your thoughts**

"I am a beneficiary of an irrevocable trust managed by Wilmington Trust, a subsidiary of M&T Bank. I am seeking an investigation into what I believe is a coordinated scheme involving fraud, misrepresentation, and potential financial crimes and criminal misconduct orchestrated by Wilmington Trust, its advisors, associated attorneys, and Andrew Papoutsis, my father (the Grantor of the trust). Through a complex network of legal and financial professionals, they have created a trust structure that limits my rightful access to trust assets, withheld critical information to negotiate me down in settlement discussions, and pressured me into disadvantageous agreements that have caused me severe financial hardship and ultimately forced me into bankruptcy. I have spent the past 12 months piecing together what has happened and believe I have uncovered significant, broader systemic misconduct.

In 2012, M&T Bank, through its subsidiary Wilmington Trust, crafted a trust structure for my father, Andrew Papoutsis, that prioritized its own long-term financial gain over the rights and interests of the beneficiaries it was

*supposedly there to protect. Papoutsis, a wealthy client with significant assets, was initially drawn to M&T Bank when taking out a loan to purchase a local business, York Sheet Metal. Seeing the opportunity to secure Papoutsis as a lifelong client and gain control of substantial assets after his passing, M&T Bank and Wilmington Trust marketed a trust product to Papoutsis that allowed him to enjoy all the benefits of placing his assets in trust without relinquishing control. Using local attorney Alex Snyder of Barley Snyder, Papoutsis presented a meticulously crafted trust agreement, a key tool designed by M&T Bank and Wilmington Trust. This trust structure was leveraged to facilitate financial maneuvers that appeared to perpetuate control over the assets, allowing Papoutsis to manage and leverage them as though they remained under his personal ownership—raising serious concerns about potential financial fraud. However, the trust terms mandate that upon Papoutsis's death, all of his businesses must be liquidated and converted to cash, thus securing a massive inflow of capital for Wilmington Trust to manage. This arrangement allowed M&T Bank not only to capture Papoutsis's assets during his lifetime but also to position itself as the de facto custodian of his wealth in perpetuity, as his children would likely leave the newly liquidated millions in the bank's investment services. In effect, Wilmington Trust's motive was clear: by designing a trust that appeared to benefit Papoutsis's family, they created a vehicle to retain and control his wealth indefinitely. This structure reduced their customer acquisition costs while ensuring a profitable, long-term client relationship across generations.*

*The motives of Wilmington Trust and M&T Bank in structuring Papoutsis's trust extend to a broader network of local attorneys and advisors who profit significantly from the high-net-worth trust and estate planning business. Attorneys Alex Snyder of Barley Snyder, McGregor Brillhart of Stock and Leader, and Bradley Leber of MPL Law have positioned themselves in this field not only because it is lucrative but also because it provides steady access to a wealthy client network. Wilmington Trust's business model thrives on referrals within affluent circles—wealthy clients like Papoutsis know other wealthy individuals and introduce them to trusted advisors. By working with Wilmington Trust, these attorneys have tapped into an ongoing stream of high-net-worth clients, building profitable relationships through the creation and maintenance of complex trusts that require continual legal oversight and generate substantial fees.*

*However, the high rewards of this business come with high risks. When problems arise within these trusts, such as in this case, these advisors are faced with the need to protect their own interests. Here, the cover-up has become worse than the crime. To shield their business model from scrutiny, these advisors appear to have coordinated efforts to obstruct my rightful access to trust distributions, effectively preventing me from accessing the funds I am entitled to. This obstruction is not merely to protect Wilmington Trust and Papoutsis but to protect themselves, as exposure of these practices could jeopardize their business and professional standing. Papoutsis is just one of many clients, and preserving the secrecy and control around this trust is essential to maintaining their lucrative practice. By withholding distributions and blocking access to information, they ensure that their role in structuring and administering such trusts goes unquestioned, protecting both themselves and the broader business model that has made this network so profitable."*

On Mon, Nov 18, 2024 at 9:07 AM Daniel Atlas <Datlas@daileyllp.com> wrote:

Irene: first and foremost, I understand your frustration and thank you for sharing them. My chief intention of that phone call was to express as your adviser what the other side was informing me, and the risks that were presented at that time as Kornfield was threatening to pull back from settlement negotiations. As I repeatedly have stated, settlement decisions are yours alone, but I wanted to inform you of the risks at that time. You expressed that you wanted to take some time to breathe from the situation, but it was still important to discuss the overall matter to be in the best position to respond to the other parties to the settlement term sheet in light of the bankruptcy. Regardless, I apologize if my intentions did not come across well on that call under difficult circumstances.

On the point you raise between settlement and litigation paths, I will repeat my previous sentiment that the path has been exclusively focused on settlement because we signed a settlement term sheet. You do not continue to litigate a matter where you sign a settlement term sheet; the point of the document is to focus your attention on completing the deal, not expending further efforts on litigation.

Also, per your request, attached is a copy of a high-level summary of the litigation for your review. I think this details the important key dates in the litigation, the key dates and correspondence in the negotiations (as discussed below, I don't want to divulge too much at this time to the trustee based on up-in-the-air attorney client privilege issues), and most importantly, it clearly states what was left to be negotiated to the term sheet, how it had not been agreed to, and no one signed it.

As discussed above, a point we had not previously discussed because I had not previously known whether you had been in contact with the trustee. It is unclear to me how the trustee will handle your attorney-client privileged communications in this matter. Based on a quick review of relevant case law, a trustee can attempt to waive that privilege on a case-by-case basis. I would recommend for now not divulging information shared pursuant to our communications. I plan to raise this issue with the trustee when we speak to have more clear guidance moving forward through the proceedings.

Finally, I have no issues with you sending your email and, frankly, would prefer it. Like you said, I also value our working relationship as we work to resolve this matter in the best possible way forward for you, so I am happy to have frank/"harsh" conversations as need be to discuss thorny subjects, clear the air and get action items on the table to keep things progressing. I appreciate you sending the email and hope it helped.

Let me know if you have any further questions, thanks

Dan

Daniel Atlas

Dailey LLP

1201 N Orange St., | Suite 7300 | Wilmington, DE 19801

T: (302) 468-5026 | datlas@DaileyLLP.com

From: Irene Mulkerin <irene.papoutsis@gmail.com>
Sent: Friday, November 15, 2024 6:25 PM
To: Daniel Atlas <Datlas@daileyllp.com>
Subject: Re: Request for Detailed Case Summary

Hey Dan,

I understand the need to communicate with the trustee directly to ensure compliance with bankruptcy laws, but first I wanted to express some concerns about our recent interactions.

On October 28th (it was Henry's 9th birthday), you adamantly requested a call repeatedly against my wishes. On that call, you strongly urged me to sign the settlement, despite me repeatedly and heatedly telling you not only that I wasn't signing anything without bankruptcy counsel because I *knew I knew* nothing about bankruptcy procedures BUT -- more importantly -- I expressed my concerns about the lack of a specific payment date and because I believe the grantor copy is significant new information, and I have not had my questions properly answered yet. It felt like compliance with bankruptcy rules wasn't on your mind at the time and that my objections were not fully considered during that conversation. Frankly, I've felt that the focus has been too heavily on the settlement for some time now, as I've mentioned before and keep trying to push me into a settlement that I do not agree to. I believe it is important to revisit the litigation strategy.

Regarding your request to communicate with the trustee, I would prefer to wait until you have prepared the case summary I requested earlier. Once I have had the opportunity to review it and ensure its accuracy, I will introduce you to the trustee, Steven Carr, via email. Once I do, please include me on all correspondence so I can be sure I know what's going on until I find a lawyer here.

I know the above sounds a bit harsh, but it's been weighing on my mind, and I needed to get this out to ensure my concerns are addressed -- I value our working relationship and want to ensure that we're on the same page.

Thanks so much, and have a great weekend!

Irene

On Fri, Nov 15, 2024 at 3:53 PM Daniel Atlas <Datlas@daileyllp.com> wrote:

That's great news Irene. Unfortunately, I will need to communicate with the trustee directly on this issue to be able to proceed. Bankruptcy laws concerning automatic stays are incredibly restrictive, and courts impose punitive damages/penalties to those who take action in violation of the stay. Accordingly, I need further confirmation directly from the trustee.

Please let me know if you would like to coordinate that introduction or have me reach out to Mr. Carr directly.

Have a good weekend,

Dan

Daniel Atlas

Dailey LLP

1201 N Orange St., | Suite 7300 | Wilmington, DE 19801

T: (302) 468-5026 | datlas@DaileyLLP.com

From: Irene Mulkerin <irene.papoutsis@gmail.com>
Sent: Friday, November 15, 2024 2:21 PM
To: Daniel Atlas <Datlas@daileyllp.com>
Subject: Re: Request for Detailed Case Summary

Hi Dan,

I wanted to let you know that the trustee in my bankruptcy case has given the all-clear for settlement discussions with the Trust to continue. In light of this, I would appreciate it if you could press for the bank information immediately to help move the process forward. Additionally, I still need a clear and detailed response to the financial and tax issues related to the Grantor Copy and the company finances from Jen or someone qualified to evaluate this properly (this is very important to me).

Thanks so much let me know when you have any updates.

Irene

On Thu, Nov 14, 2024 at 12:12 PM Irene Mulkerin <irene.papoutsis@gmail.com> wrote:

Thanks so much for preparing the case summary. The trustee recommended that I get a comprehensive case summary from you to help me navigate the complexities of the case, particularly given my inability to find counsel thus far and the continued pressure to settle in an effort to help me be better prepared to find an attorney.

At this time, I'd prefer to keep correspondence between us, so there's no need to reach out to the trustee on this point. Along with the case summary, could you also include a breakdown of all major case actions and a summary of any notable correspondence with the opposing side? Pls include key details on the negotiation history and any developments related to the settlement discussions, especially any instances where I did not formally agree to terms, as the opposing side is asserting. This would help reinforce that I have not agreed to settle, which is important.

Thanks so much,

Irene

On Thu, Nov 14, 2024 at 11:27 AM Daniel Atlas <Datlas@daileyllp.com> wrote:

Irene: happy to provide. I have a filing today I'm working on, but can draft tonight.

Do you have any written correspondence with the trustee on this point that you can provide for more clarity? If not, can I email him (cc'ing you) to make an introduction and inquire further? Would prefer to get it right the first time/cut out any back and forth delay.

Daniel Atlas

Dailey LLP

1201 N Orange St., | Suite 7300 | Wilmington, DE 19801

T: (302) 468-5026 | datlas@DaileyLLP.com

From: Irene Mulkerin <irene.papoutsis@gmail.com>
Sent: Thursday, November 14, 2024 11:21 AM
To: Daniel Atlas <Datlas@daileyllp.com>
Subject: Request for Detailed Case Summary

Hey Dan,

I wanted to follow up on an action item from my meeting with the bankruptcy trustee. One of the steps we discussed was obtaining a detailed summary of my case from you. Could you please provide me with a comprehensive case summary? I believe this is necessary for my bankruptcy case.

Thanks so much,

Irene

--

Sincerely, Irene Mulkerin

Attachments:

Email from Andy Mulkern dated November 20, 2024 sent at 8:41 AM

Subject: Re: Objection to FLP Sale and Request for Information
From: Irene Mulkerin <irene.mulkerin@outlook.com>
Date: 11/25/24, 11:42 AM
To: Steven Carr <carr20@aol.com>
BCC: Andy Mulkerin <andy.mulkerin.pro-se@outlook.com>

Dear Mr. Carr,

I noticed that you did not address my specific question regarding potential conflicts of interest or collaboration with Bradley Leber, McGregor Brillhart, Alex Snyder, and now others, including my father, Mr. Chernicoff (represents who?), and Wilmington Trust Company. Given the seriousness of this issue, I must ask for a clear response.

If I do not receive clarification, I will interpret your silence as a tacit acknowledgment of these connections. Your lack of transparency on this matter, combined with the actions I've observed, raises significant concerns about whether my interests as a debtor are being properly represented.

Please confirm whether you are working with or have had any communications with these parties outside of the scope of your fiduciary duties. If so, please explain the nature of those interactions immediately.

Your prompt and forthright response is appreciated.


Sincerely,
Irene Mulkerin

Concision and typos courtesy of on-the-go technology.

On Nov 25, 2024, at 11:26AM, Steven Carr <carr20@aol.com> wrote:

Your "objection" is exactly what I warned about from the outset, and the reason that I suggested that I proceed with a liquidation of the trust interest first. Given your opposition to the sale of the partnership interest on the terms that I was able to negotiate, I will place that sale on hold and pursue the trust settlement.


**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

In a message dated 11/25/2024 11:13:45 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

Dear Mr. Carr,

I am writing to formally object to the proposed acceptance of the $500,000 offer for my interest in the Andrew V. Papoutsis Family Limited Partnership (FLP).

As we previously discussed, I believe this offer significantly undervalues my interest in the Family Limited Partnership (FLP). The partnership holds substantial assets, including real estate valued between $10–12 million, as well as considerable cash reserves. I have already provided evidence supporting a higher valuation, including appraisals, sales records, K-1 documents, and partnership tax returns, which reveal millions in unexplained distributions.

Before any further action is taken, I respectfully request the following:

1. Detailed Valuation Information:
   - Please provide a comprehensive explanation of how the $500,000 offer was determined.
   - Include any appraisals, valuations, or assessments conducted to arrive at this figure.
   - Please provide a detailed list of all documents requested, including who the requests were directed to, the nature of the documents requested, and the outcomes of those requests. As I have previously indicated, and continue to emphasize, there is an extremely high likelihood of fraud, potentially on a large scale, that you need to be fully aware of and consider. This information is critical to ensuring a thorough and accurate assessment of the situation.
   - For the documents you did receive—including those I provided to you electronically and during our in-person meeting when my husband and I came to your office at 9:30 a.m. on Monday, November 11—did you thoroughly review them? Please provide an explanation of how these documents were considered in your analysis and how they informed your decision-making process, particularly as it relates to this rushed "fire sale" approach, which appears to prioritize benefiting my creditors over maximizing the value of my estate.
   - Outline the efforts made to market the FLP interest and any other offers or inquiries received.
   - Please provide a detailed outline of any and all efforts undertaken to recover the $1.4 million or any of the other cash assets associated with this matter. Include the steps taken, parties involved, and any outcomes or ongoing actions related to these recovery efforts.

2. Disclosure of Potential Conflicts of Interest:
   - Given what I would describe as very odd behavior in administering my bankruptcy case as the trustee, I have to ask politely but firmly: Are you acquainted with or in communication or cooperation with any of the following individuals?
     - Bradley Leber, Esq.
     - McGregor Brillhart, Esq.
     - Alex Snyder, Esq.
   - I believe you have a duty to identify any conflicts. Please do so immediately.

3. Review of Additional Information:
   - My husband, Andy Mulkerin, sent you an email this morning outlining potential opportunities to maximize the value of my estate. I have attached his email for your reference.
   - I request that you review his suggestions and consider them in your assessment. He is available to discuss these points with you directly if that would be helpful.
   - Additionally, I have not received any response from you regarding the concerns I outlined in my email to you on Thursday, November 21, 2024. These concerns pertain to the litigation and valuation of the estate asset TT/Papoutsis Family Trust, deeded on December 13, 2012, as well as a draft complaint introduction highlighting significant issues of potential fraud and misconduct related to my case.
   - Whether or not you believe the information is relevant, I do, and I am confident that Judge Van Eck will find it relevant as well. Please review the information carefully. For your convenience, I have reiterated many of my current concerns on the matter below, as I trust you will recall.


Irene Mulkerin

**Subject: Re: Objection to FLP Sale and Request for Information**
**From:** Steven Carr <carr20@aol.com>
**Date:** 11/25/24, 11:26 AM
**To:** Irene.mulkerin@outlook.com

Your "objection" is exactly what I warned about from the outset, and the reason that I suggested that I proceed with a liquidation of the trust interest first. Given your opposition to the sale of the partnership interest on the terms that I was able to negotiate, I will place that sale on hold and pursue the trust settlement.

Steven M. Carr, Esquire
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

In a message dated 11/25/2024 11:13:45 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

Dear Mr. Carr,

I am writing to formally object to the proposed acceptance of the $500,000 offer for my interest in the Andrew V. Papoutsis Family Limited Partnership (FLP).

As we previously discussed, I believe this offer significantly undervalues my interest in the Family Limited Partnership (FLP). The partnership holds substantial assets, including real estate valued between $10–12 million, as well as considerable cash reserves. I have already provided evidence supporting a higher valuation, including appraisals, sales records, K-1 documents, and partnership tax returns, which reveal millions in unexplained distributions.

Before any further action is taken, I respectfully request the following:

1. **Detailed Valuation Information:**
   - Please provide a comprehensive explanation of how the $500,000 offer was determined.
   - Include any appraisals, valuations, or assessments conducted to arrive at this figure.
   - Please provide a detailed list of all documents requested, including who the requests were directed to, the nature of the documents requested, and the outcomes of those requests. As I have previously indicated, and continue to emphasize, there is an extremely high likelihood of fraud, potentially on a large scale, that you need to be fully aware of and consider. This information is critical to ensuring a thorough and accurate assessment of the situation.
   - For the documents you did receive—including those I provided to you electronically and during our in-person meeting when my husband and I came to your office at 9:30 a.m. on Monday, November 11 —did you thoroughly review them? Please provide an explanation of how these documents were considered in your analysis and how they informed your decision-making process, particularly as it relates to this rushed "fire sale" approach, which appears to prioritize benefiting my creditors over maximizing the value of my estate.
   - Outline the efforts made to market the FLP interest and any other offers or inquiries received.
   - Please provide a detailed outline of any and all efforts undertaken to recover the $1.4 million or any of the other cash assets associated with this matter. Include the steps taken, parties involved, and any outcomes or ongoing actions related to these recovery efforts.

2. **Disclosure of Potential Conflicts of Interest:**
   - Given what I would describe as very odd behavior in administering my bankruptcy case as the trustee, I have to ask politely but firmly: Are you acquainted with or in communication or cooperation with any of the following individuals?
     - Bradley Leber, Esq.
     - McGregor Brillhart, Esq.
     - Alex Snyder, Esq.
   - I believe you have a duty to identify any conflicts. Please do so immediately.

3. **Review of Additional Information:**
   - My husband, Andy Mulkerin, sent you an email this morning outlining potential opportunities to maximize the value of my estate. I have attached his email for your reference.
   - I request that you review his suggestions and consider them in your assessment. He is available to discuss these points with you directly if that would be helpful.
   - Additionally, I have not received any response from you regarding the concerns I outlined in my email to you on Thursday, November 21, 2024. These concerns pertain to the litigation and valuation of the estate asset TT/Papoutsis Family Trust, deeded on December 13, 2012, as well as a draft complaint introduction highlighting significant issues of potential fraud and misconduct related to my case.
   - Whether or not you believe the information is relevant, I do, and I am confident that Judge Van Eck will find it relevant as well. Please review the information carefully. For your convenience, I have reiterated many of my current concerns on the matter below, as I trust you will recall.

Irene Mulkerin

▣Reply

▣Reply all

▣Forward

To:Steven Carr

Thu 11/21/2024 10:57 AM

▣

High importance

▣

You forwarded this message on Thu 11/21/2024 3:18 PM

Dear Mr. Carr,

I hope your week has been going well. I wanted to provide a brief update regarding my attorney, as I'm feeling quite frustrated with his handling of my concerns at the moment. While I know you can't offer legal advice, see below, he wants to talk to you directly, so I wanted to ensure you have the right context for anything Dan might discuss with you. I apologize that I said that you wanted a case summary (I know you didn't ask for that) but I have been having a lot of trouble getting him to address my issues.

Thank you so much!

Best,
Irene

--------- Forwarded message ---------
From: Irene Mulkerin <irene.papoutsis@gmail.com>

**Subject:** trust litigation
**From:** Steven Carr <carr20@aol.com>
**Date:** 11/25/24, 11:04 AM
**To:** irene.mulkerin@outlook.com
**CC:** Datlas@daileyllp.com

Ms. Mulkerin:

In your email of November 14, 2024, you stated that you were considering proceeding concurrently with the trust settlement and the liquidation of the limited partnership. In response, I advised: "The Wilmington Trust litigation is property of the estate and therefore within my "control," not yours. But I have no issue with you doing whatever you feel you need to do in order to remove your "objection" to the settlement."

Subsequently, in my email of November 22, 2024, in response to your inquiry, "I advised that the moment you filed bankruptcy, your assets became property of the bankruptcy estate. Thus, you no longer have any right or authority to sell, manage, or control any of the assets. That includes litigation. Rather, the power to sell, manage, and control vests in me as trustee."

I have become aware that shortly after my November 22, 2024, you sent a threatening email to the Trustees of the Trust threatening further litigation against the Trusts. Further, you have advised Attorney Chernicoff that he is not authorized to discuss anything with Attorney Atlas until you were satisfied as to whom he represents.

From my perspective as Trustee, both actions threaten the settlement of the Trust litigation and are unacceptable to me as Trustee. It also does not remotely fall within any notion of removing your objection to the settlement. Rather, it is the direct opposite.

I again state that the Trust litigation and possible settlement thereof is property of the bankruptcy estate and subject to my authority and control. The only reason that I have not moved to liquidate that asset to date is because I have acquiesced in your request that I first liquidate the limited partnership interest in the hopes that I obtain sufficient monies to pay all of your claims and then abandon the trust litigation "back to you."

I cannot and will not permit the potential settlement of the trust litigation to be jeopardized by your conduct while it is property of the estate. Thus, if you expect me to continue to keep the trust litigation resolution "on hold," you must cease from any further threats directly or indirectly to the Trustees and their representatives. You must also stop trying to thwart counsel from doing their duties by attempting to impose conditions on how they do their jobs.

If you fail to do so, I will have no choice but to pursue the settlement before it becomes lost as a result of your conduct.

I am copying Attorney Atlas on this email so that my position on this issue is clear to him and so that he can appropriately represent the bankruptcy estate's interest in the litigation and your possible future interest in that litigation.

**Steven M. Carr, Esquire**
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

Subject: Re: Objection to FLP Sale and Request for Information
From: Irene Mulkerin <irene.mulkerin@outlook.com>
Date: 11/27/24, 4:15 PM
To: Steven Carr <carr20@aol.com>
CC: "andy.mulkerin.pro-se@outlook.com" <andy.mulkerin.pro-se@outlook.com>

Subject: Response Regarding Settlement and FLP Interest Valuation

Dear Mr. Carr,

I appreciate your acknowledgment of my position.

You stated that you negotiated a sale of the limited partnership interest, which you believe is fair and reasonable based on your business judgment as trustee. However, I have not been provided with sufficient information to assess this determination. Specifically, I would appreciate if you could provide the following:

1. Valuation Details:

   ◦ How did you arrive at the $500,000 figure as the appropriate valuation for my FLP interest?

   ◦ What valuation methods were used, and what assumptions were made?

   ◦ Have you considered the appraised value of the real property assets, which totals just over $10 million? My 32% ownership stake and accumulated profits should yield significantly more than the proposed amount.

   ◦ What about the real estate transactions I brought to your attention that are neither accounted for in the listed assets nor reflected in the reported profits?

   2. Documentation:

   ◦ What documents did you request and review in making your valuation?

   ◦ Have you examined all relevant bank accounts, including balances and recent transfers? As you know, I have long been denied access to this information.

   ◦ Could you provide a list of the documents you've obtained and those you may still need?

3. Offer Details:

   ◦ Who is the offer from, and what are the specific terms?

   ◦ How quickly does the proposed sale close?

   ◦ Does the buyer have access to the partnership bank accounts where I have not? This might present legal issues that need to be addressed.

4. Business Judgment Explanation:

   ◦ Please lay out your business judgment in detail so I can understand how you concluded that this offer is in the best interest of the estate and the creditors.

   ◦ Have you sought or considered obtaining multiple offers to ensure we are maximizing the value of my assets?

I understand your duty as trustee to liquidate assets, however, it is essential that this process is conducted transparently and in a manner that truly maximizes value for all parties involved. I am willing to consider your "business judgment", but I need a detailed written explanation and access to the relevant information to make an informed decision.

Irene

---

From: Steven Carr <carr20@aol.com>
Sent: Monday, November 25, 2024 1:35 PM
To: Irene Mulkerin <irene.mulkerin@outlook.com>
Subject: Re: Objection to FLP Sale and Request for Information

My duty as Trustee is set forth in section 704 of the bankruptcy code. That does not include responding to any question that you might pose to me. You may not interpret my non-answer to any particular question as anything other than my choosing not to answer. Any non-answer is not an admission, tacit or otherwise, of anything.

While my answer is not required, I do not have any conflicts that interfere with my ability to serve as Trustee in this case, nor do I have any conflicts with the adverse parties you mention, your father and Wilmington Trust, nor the attorneys you reference.

Steven M. Carr, Esquire
Ream, Carr, Markey, Woloshin & Hunter, LLP
119 East Market Street
York, PA 17401
717-843-8968
717-846-4999 (fax)

This email, including attachments, is covered by the Electronic Communications Privacy Act, USC 2510-2521, is confidential and is legally privileged. This message may also be privileged and attorney work product. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others. You are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this in error, please notify me immediately, return the original to me by email, and delete the message from your computer system.

In a message dated 11/25/2024 11:43:04 AM Eastern Standard Time, irene.mulkerin@outlook.com writes:

Dear Mr. Carr,

I noticed that you did not address my specific question regarding potential conflicts of interest or collaboration with Bradley Leber, McGregor Brillhart, Alex Snyder, and now others, including my father, Mr. Chernicoff (represents who?), and Wilmington Trust Company. Given the seriousness of this issue, I must ask for a clear response.

If I do not receive clarification, I will interpret your silence as a tacit acknowledgment of these connections. Your lack of transparency on this matter, combined with the actions I've observed, raises significant concerns about whether my interests as a debtor are being properly represented.

Please confirm whether you are working with or have had any communications with these parties outside of the scope of your fiduciary duties. If so, please explain the nature of those interactions immediately.

Your prompt and forthright response is appreciated.

Sincerely,
Irene Mulkerin

Concision and typos courtesy of on-the-go technology.

On Nov 25, 2024, at 11:26AM, Steven Carr <carr20@aol.com> wrote:

Your "objection" is exactly what I warned about from the outset, and the reason that I suggested that I proceed with a liquidation of the trust interest first. Given your opposition to the sale of the partnership interest on the terms that I was able to negotiate, I will place that sale on hold and pursue the trust settlement.

Steven M. Carr, Esquire